FILED
2016 Nov-30 AM 10:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

Tiffany Roper
Pro Se
P.O. Box 110205
Birmingham, Al 35211
Tel: 205-680-9165
Fax: 800-878-0533
ropertiffany@gmail.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

Southern Division

| | |
|---|---|
| TIFFANY ROPER,<br><br>Plaintiff,<br><br>vs.<br><br>CNU OF ALABAMA, LLC A/D/B/A CASHNETUSA.COM AND CNU ONLINE HOLDINGS, LLC, DEBT MANAGEMENT PARTNERS, LLC, ADAM MARCH, DANIEL VALENTINE; SOLUTIONS TO PORTFOLIOS, LLC A/D/B/A STP GROUP, LLC A/D/B/A/ STP MANAGEMENT GROUP, LLC; A/D/B/A ACDI GROUP LLC; ANTHONY SWATSWORTH; AND JOHN DOES 1-6 A/D/B/A MR. BELL - LEGAL OUTSOURCING; TIM RUSSO & C.J tHOMPSON OF ANDERSON & DAVIS GROUP A/D/B/A A&D GROUP; NIC – STEVE ANDERSON; Defendants | Case No.: [Number]<br><br>CV-16-SGC-1911-S<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1. This is an action for damages are brought against the Defendants and/or debt collectors for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., ; Telephone Consumer Protection Act ("TCPA") – 47 U.S.C.§ 227 *et seq* and Federal Communications Commission (FCC) – Code of Federal Register - 47 CFR 64.

2. Upon information and belief, Defendants, along with other entities and individuals to be identified in discovery, are involved in a fraudulent, ongoing scheme to collect monies from alleged bad debts through known illegal and harassing scare tactics. Tactics that have included but not limited to; threats of litigation and garnishments, the employment of call blocked numbers and/or called id numbers with the Plaintiff's area code when the call has originated from another state; increased court cost and high interest fees, as well as the use of false business and call representative's names. When companies such as the listed defendants and others are sued for violations of the FDCPA and TCPA, many of the entities default, accumulate default judgments and continue to operate under a progression of the creation of other Limited Liability Companies, with shared business addresses.

## JURISDICTION

3. Jurisdiction of this Court arises under 28 U.S.C § 1331 and 28 U.S.C. § 1367. In addition, this Court has supplemental jurisdiction regarding Plaintiff's claims under 15 U.S.C.§ 1692k(d); 47 U.S.C § 227 et seq and 47 C.F.R 64; which the Plaintiff's claim are predicated on.

4. Venue is proper in the United States District Court for the Northern Division of Alabama pursuant to 28 U.S.C § 1391 (b) & (c) ; because the acts and transactions occurred here in Birmingham, Jefferson County, Alabama, in addition to the fact that the Plaintiff resides within the Jefferson County, Al.

## PARTIES

5. Plaintiff Tiffany Roper (hereinafter "Plaintiff") is a natural person who resides in the City of Clay, County of Jefferson, State of Alabama; and is a "consumer" as defined by 15 U.S.C § 1692a (3) and/or a "person" defined by 47 U.S.C. § 153 (39) affected by a violation of FDCPA, TCPA and FCC act(s) with standing to bring this claim under 15 U.S.C § 1692k(a).

6. CashNetUSA.com online loans are originated from ApplyAdvanceAmerica.com; are offered and funded by CashNetUSA, and marketed by Advance America. CashNetUSA is listed as a subsidiary of Cash America International, Inc. Cnu Of Alabama, Llc operates as a subsidiary of Cnu Online Holdings, LLC. Enova Financial Holdings, LLC and CNU Online Holdings, LLC are also subsidiaries of Cash America International, Inc with incorporations in Delaware. The registered agent is listed as Capitol Corporate Services Inc. According to the Enova website; "CashNetUSA is the flagship brand of Enova International. It was among the first licensed short-term lenders to provide cash advances and installment loans to consumers over the Internet. Now available in more than 30 states and counting, CashNetUSA is considered one of the leading online lenders."

More specifically, previous court filings regarding CashNetUSA identify the following that: "the CNU of Alabama, LLC d/b/a CashNetUSA is a wholly-owned subsidiary of CNU Online Holdings, LLC, which is a wholly-owned subsidiary of Enova Online Services, LLC, which is a wholly-owned subsidiary of Enova International, Inc., which is a publicly traded company. CashNetUSA is a "creditor" as the term is defined and used in the FDCPA.

7. Debt Management Partners LLC ("DMP"), FEIN – 26-0875852, is a Delaware Limited Liability Corporation. DMP does business at 200 John James Audubon Parkway, Amherst, New York 14068. The registered agent for DMP is United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904. According to DMP's internet

website (www.dmpllc.biz); DMP "is a buyer of charged-off consumer receivable." UCC filing statements show that DMP is owned by and managed by Adam D. March and Daniel J. Valentine. Additionally, DMP is also known and advertised as a "debt collector" as the term is defined and used in the FDCPA. They are a member of ACA International, a trade group of debt collectors and also participate in the usage of interstate commerce and the mail in a business with primary purposes involving the collection of debts.

8. Defendant Adam March is an individual, who purportedly resides in Buffalo, NY. According to documents filed in the State of Delaware, Mr. March is a managing member of the Defendant Debt Management Partners LLC. Furthermore, according to information provided by Mr. March on the business website LinkedIn; Adam March -

"**Member** - Debt Management Partners September 2007 – Present (9 years 3 months) Amherst, NY

As a Member of DMP it has grown to one of the largest buyers of subprime consumer delinquencies in the country. DMP supports hundreds of call center representatives nationwide, has a dedicated inbound call center focused strictly on consumer questions and concerns prior to speaking with a collection representative, and adheres to the highest standards of compliance and brand protection. I invite all prospective selling lenders to visit our facilities to see first-hand our company standards.
Prospective debt buyers and servicers, please feel free to reach out to apply for our due diligence overview on dmpcollections.com."

Since 2005, DMP has consulted on and or purchased hundreds of millions of dollars of receivables and assisted in expanding companies in the credit and collection industry. Adam March is part owner, operator and manager of DMP.

9. Daniel Valentine - is a natural person that purportedly resides in Buffalo, NY. Daniel Valentine is listed as a Principal and CEO of Debt Management Partners on its Better Business Bureau ("BBB") company profile page. Mr. Valentine is also a managing member who regularly participates in the collection or attempted collections, either

directly or indirectly, debts owed or due or asserted to be owed for due another. Mr. Valentine uses interstate commerce and the mails in a business the principal purpose of which is the collection of debts. Furthermore, Mr. Valentine is a "debt collector" as the term is defined and/or used in the FDCPA.

10. Solutions to Portfolios ("STP"), who also does business as STP Management Group, is an active Limited Liability Company with Articles of Organization filed with the State of North Carolina's Department of the Secretary of State and is listed as a Manager-Managed LLC. STP's managing member/owner is reported as Anthony Swatsworth. Mr. Swatsworth was also listed as the registered agent with an address of 2300 Crownpoint Executive Drive, Suite J. Charlotte, NC 28227; in the County of Mecklenburg when STP LLC was formed in 2012. Since this time, 2014 UCC filings show a mailing address for STP as 1727 Sardis Rd N, Suite 161, Charlotte, NC 28270-2539. The Better Business Bureau lists the address for STP as 10020 Monroe Rd STE 170-261;
Matthews, NC 28105-5485; which is a postal mailing box. However, the 2016 Annual Report filed with the State by STP lists an address as of 1805 Sardis Rd North Suite 100, Charlotte, NC 28270. Since 2012, STP has incorporated in other states such as California, Florida, Texas, New York, Kansas, Washington and Virginia to operate businesses regarding call centers and/or debt collection.

STP is an active debt buying and debt selling company and has filed multiple UCC financing statements with the State of North Carolina where consumer debt was purchased from defendant's Debt Management Partners, LLC involving Cashnet and Check-N-Go payday loans. STP uses interstate commerce and the mails in a business the principal purpose of which is the collection of debts. STP regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed and due another. STP is a "debt collector" as the term defined and used in the FDCPA. STP directly and indirectly participated in the unlawful debt collection practices to collect an alleged debt from Plaintiff that will be later described in this complaint.

Lastly, STP maintains an internet website (www.stpmanagementgroup.com) that states: "The STP Management Group is a collection agency based in Charlotte, NC that partners with creditors to provide first class receivables management solutions. STP Management Group has been providing our creditor partners with a reliable recovery partner since 2011. Our experienced management team and highly trained recovery professionals help our clients to maximize the value of their receivables while reducing risk to their brand reputation." It further states that "they specialize in assisting creditors with managing accounts receivable portfolios containing consumer loans, automotive loans and leases, unsecured loans, medical" and "our team uses cutting edge technology, skilled staff and proven processes to achieve the bottom-line results our partners need."

11. Defendant ACDI Group, LLC ("ACDI") is an active North Carolina Limited Liability Company. ACDI does business at 1805 Sardis Road North, Suite 100, Charlotte, North Carolina , 28270-1497, the same address listed for STP. Reportedly, both companies share and co-mingle. According the North Carolina registry lists 1727 SARDIS RD N SUITE 161, CHARLOTTE NC 28270. THE SAME ADDRESS PREVIOUSLY LISTED FOR STP Management Group. The registered agent and managing member for ACDI is also defendant, Anthony Swatsworth. ACDI's 2015 annual filing report lists 10020 Monroe Rd STE 170-261; Matthews, NC 28105-5485 as its mailing and principal address.

ACDI also uses interstate commerce and the mails in a business in which it principal purpose is in the collection of debts. ACDI regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed and due another. ACDI's primary focus is debt collection and is therefore a "debt collector" as the term defined and used in the FDCPA. Upon information and good faith belief, ACDI directly and indirectly participated in the unlawful debt collection practices to collect an alleged debt from Plaintiff that will be described in this complaint. ACDI has also financed purchases for bad debt accounts as evidenced by an August 2015 UCC Finance Statement with PNC Bank listed as the secured party and filed with the Secretary of State of North Carolina.

12. Anthony Swatsworth is an individual, purportedly residing at 9101 Hinson Dr, Matthews, NC 28105. According to documents filed by Mr. Swatsworth with the State of North Carolina, New York, California, Florida, Texas, Virginia, Louisiana and others; Mr. Swatworth holds either a managing – manager or managing- member designation within these STP LLCs, as well ACDI Group, LLC. In addition, Mr. Swatsworth is the owner, manager and agent of Defendants STP and ACDI. Furthermore, according to Mr. Swatsworth's LinkedIn account, Mr. Swatsworth is the: President -STP Management Group April 2011 – Present (5 years 8 months); and was previously a Manager - NCO Financial Systems August 1999 – April 2010 (10 years 9 months)Charlotte, North Carolina Area. While in that capacity, Mr. Swatsworth duties included - Debt collector, Supervisor, Divisional manager, managed many different clients. Citibank retail, ADT Security and Chase Bank major credit cards.

Mr. Swatsworth created the collection practices and procedures used by STP and ACDI and its employees, manages the daily collection operations of STP and ACDI, oversees the application of the collection policies and procedures used by STP and ACDI and its employees and ratifies the unlawful debt collection practices used by STP and ACDI, its employees and 3rd party debt buyers. Mr. Swatsworth uses interstate commerce and the mails in a business whose principal purpose of which is the collection of debts. Mr. Swatsworth is a "debt collector" as the term is defined and/or used in the FDCPA.

Furthermore, it is upon Plaintiff's belief that in Mr. Swatsworths' roles as managing member, managing - manager, owner and operator of both STP and ACDI and from previous positions in his former job; he was also responsible for the drafting, creation and approval of the tactics and scripts used by interoffice call center call representatives. Additionally, Mr. Swatsworth had knowledge of, approved, participated in, and ratified the unlawful debt collection practices used by his employees and other 3rd party debt

buyers whom he sold accounts to; which included Plaintiff's account; after failing to collect on the debt from his in-house collection agencies.

13. John Doe 1 - Defendant Mr. Bell with Legal Outsourcing ("Mr. Bell) is a company involved in 3rd party consumer debt buying and recovery/collection and is a "debt collector" as the term defined and used in the FDCPA. Through discovery, it will be determined whether Mr. Bell with Legal Outsourcing is a true identity. Additionally, through discovery, the agency relationship between Mr. Bell, STP and Anthony Swatsworth will be verified and a determination made if Defendants STP and Anthony Swatsworth sold 100% or a lower % of Plaintiff's account to Mr. Bell or just assigned the debt to be Mr. Bell's collection agency. Plaintiff avers that Mr. Bell is an employee and/or agent of the defendant's STP, ACDI or Anthony Swatsworth's call center; engaging in this unlawful debt collection scheme, regardless. Mr. Bell uses interstate commerce and the mails in a business whose principal purpose of which is the collection of debts.

14. John Doe 2 - Steve Anderson -("NIC") (National Information Center) (National Law Center) is a company involved in 3rd party consumer debt buying and recovery/collection and is a "debt collector" as the term defined and used in the FDCPA. It will be determined through discovery whether NIC and Steve Anderson is the true name and real separate entity as presented to the Plaintiff or whether Mr. Anderson is simply an employee, partner and/or agent of the defendant's STP, ACDI or Anthony Swatsworth's call center. NIC uses interstate commerce and the mails in a business whose principal purpose of which is the collection of debts.

15. John Doe 3 - Anderson & Davis Group ("A&D Group) - is a company involved in 3rd party consumer debt buying and recovery/collection and is a "debt collector" as the term defined and used in the FDCPA. It will be determined through discovery whether the A&D Group is in fact, a true separate entity as a 3rd party debt buyer, or whether owners/employees - Tim Russo & C. J Thompson are simply employees, agents, partners

of the defendant's STP, ACDI and/or Anthony Swatsworth's call center and engaging in this unlawful debt collection scheme. A&D Group uses interstate commerce and the mails in a business whose principal purpose of which is the collection of debts.

16. Debt Management Partners, Mr. Valentine and Mr. March are in the business of purchasing delinquent consumer loan accounts, at a discounted rate from companies such as CashNetUSA. For many years, DMP, Mr. Valentine and Mr. March would attempt to collect on these debts but more recently have transitioned and became primarily a debt seller. DMP, Mr. Valentine and Mr. March place the accounts for a selection to purchase with a select group of third-party debt collectors, such as STP. Mr. March and DMP has provided consulting services, capital and equipment for startup purposes for members of STP and others collection agencies.

**STATEMENT OF FACTS**

17. In October of 2013, plaintiff Tiffany Roper borrowed 500.00 from an entity identified online by the name of Advance America. Advance America's online loans are originated from ApplyAdvanceAmerica, are offered and funded by CashNetUSA, and marketed by Advance America. CashNetUSA is listed as a subsidiary of Cash America International, Inc and CNU Holdings of Alabama, LLC.

An extension on the initial loan payment was processed on 10/25/13 and the new payment date was extended until 11/08/13 for a total of 587.50. Account number 1617217 was assigned to file. The Plaintiff became unable to repay the debt and the account became delinquent. From 11/2013 until 02/18/14, collection email notices were sent about the overdue account to Plaintiff's email. Additionally, during this time, several drafts from Plaintiff's checking account were attempted by CashNetUSA's collection's department for different amounts, oftentimes, several a day. The collection actions by CashNetUSA caused the Plaintiff to have to issue a stop payment on the account to avoid

incurring additional overdraft charges for attempted ACH draft occurrences made by CashNetUSA.

18. At that time, the outstanding balance was reported as 587.50 per Advance America's website.

19. Upon information and belief, Debt Management Partners bought Plaintiffs' account and attempted to collect on it for a period of months through in-house collection agencies; but to no avail. The debt was then reportedly sold to a long-time business partner – Defendants - Solutions to Portfolios, LLC; ACDI and Anthony Swatsworth for an unknown amount.

20. Upon information and belief, Defendants STP, ACDI and Anthony Swatsworth handled and maintained the account and attempted to collect on debts solely for many months, at least until early September of 2014. Plaintiff avers that Defendants used an ATDS device to make those calls from their call center and from other collection agencies to Plaintiff's cellular phone. Additionally, Defendants failed to identify themselves, validate the debt, continued to call Plaintiff's work number (after being instructed not to) and threatened actions not intended. Message Plaintiff claims her FDCPA, TCPA and FCC rights were violated. Plaintiff initially documented the calls, which were left on the Plaintiff's work phone and cell phone but since that time, Plaintiff's work and cell phone has been replaced. Message left from STP referenced an internal case file of CS1056.

21. Upon information and belief, Defendants STP, ACDI and Anthony Swatsworth maintained direct and indirect control over Plaintiff's account but later (mid September 2014 – account was reportedly purchased by Defendant Legal Outsourcing – Mr. Bell) enlisted additional collection efforts of Plaintiff's account through other debt buyer brokers, more specifically Defendants who identified themselves as the following: " Legal Outsourcing - Mr. Bell", "NIC – Steven Anderson" and/or "the A&D Group, JS Recovery – Mark Marshall".

22. Upon information and belief, Defendants - John Does 1-3 are the managers, operators, supervisors, employees, brokers, and /or authorized agents of Defendants – CashNetUSA, DMP, Adam March, Daniel Valentine, STP, ACDI, and Anthony Swatsworth and have or have had, direct or indirect control over the daily operations of such account at some period during Plaintiff's 2 years of harassment. Plaintiff's claims were made in good faith belief, following several recent conversations between the Plaintiff and agents, representatives and/or employees of the aforementioned defendants, excluding CashNetUSA.

Plaintiff initially contacted the Defendants – DMP and STP and reached their employees, agents and/or authorized representatives on 09/19/16. While Plaintiff was attempting to gather sufficient and truthful information concerning the alleged debt, and rightful account holder, Plaintiff contacted DMP. Plaintiff was informed by a female DMP representative the amount of the debt, original account holder as CashNetUSA and further stated that the debt has been sold to DMP and for further information to contact them. When asked if STP was the current holder of the account, the representative stated that she did not know but that STP could tell me who had it, if not them because that was where DMP sent it. Specifically she stated, "if they sold it, they should be able to tell me and that would be called…following the chain of title."

As such on 09/19/16, Plaintiff then contacted STP and spoke with a female who identified herself as Angela. During this 9 minute conversation, the following information was obtained and/or discussed.

Angela verified that the account was a CashNet account and then asked if I had received any other kinds of calls about the debt, in which the Plaintiff informed Angela that she was not sure because when she returned calls to the other numbers, they could not give me any information. At the point the following recorded conversation was had, Angela stated "we (STP) do have it in our office, I do need to advise you real quick that the phone call may be recorded and that this is an attempt to collect a debt and that

information obtained would be used for that purpose. It is in regards to a CashNet loan that was deposited into your account."

Plaintiff – "ok, now….So you say you all have it?

**Angela** – "yes, it is in our office",

Plaintiff – "what does that mean?"

Angela's tone change and her answers were viewed to become a little evasive when she replied…"it was over to our office for collection but umm, I am not sure if it has been released out, that's why I said if anybody hasn't contacted you."

Plaintiff – "well like I said, I had some calls from dealing with a debt or something but they never left any information as far the name of the company and when I tried to call them back a minute ago, one company said they were GLP Legal Processing and the other said they were JS Recovery."

**Angela** – "oh"

Plaintiff - "they asked me if I had a case number and I listed to the message but there was no case number, do you all have a case number or something."

**Angela** – "no, I don't have that.", "So when you contacted those office what did they say."

The conversation continued about returning calls to the other companies and providing them my social, in hopes that they could pull the information up after Angela claimed not to know the whereabouts of my file, contradicting the DMP representative's statement that STP could inform Plaintiff. Angela instructed the Plaintiff to be skeptical though and she again verified that it was a CashNet loan taken out on 10/15/13 and released from CashNet's office on 01/08/14.

Plaintiff – "where does it go then?"

**Angela** – "that's where it went to, I believe that it went to Debt Management Partner and then came over to our office."

Plaintiff – "Ok, so are you all in the same building or are they just a different company?"

**Angela** – "No, we are all different companies."

Plaintiff – "So when you say it's in ya'll building, as far as you see it, what does that mean?"

**Angela** – "been released…..No, I said it was in our office, but it could have been released out but since we are the ones that have it in and that's what is showing, we can always pull it back from that other agency……So if you have any issues with the other companies, you can always contact my office back and we can get you the proper credit and pull it back from them."

Plaintiff – "ok…but you don't know who it was sent to?"

**Angela** – "No, ma'am."

Plaintiff – "ok, So,.ok, so..I'm not understanding..So if you don't know who it was sent to, how do you know how to pull it back if I can't find out anything?"

**Angela** – "oh, that's upper management, I wouldn't have any….I would have to go and send that to upper management but I would not have anything to do with that."

Plaintiff – "So your company released it to somebody else and those people are the ones trying to collect now?

**Angela** – "I'm not saying yes or no because you don't know the specific account they are calling about."

Angela continued by giving the Plaintiff the original account number for the CashNet account so that Plaintiff would have that information when contacting the other companies again. However, Angela could not give the Plaintiff a date when asked by the Plaintiff – "do you know when it was released to someone else?"

**Angela** – "No, umm, that would be management to…I would say probably within the last year and that would be a guesstimate." The account is??…..The original account number should always be the same.

Plaintiff – "If I ask them to verify the account, would the companies give me a different number or this number?"

**Angela** – "They would probably have a different internal account number but I would not know what that is." "Some agencies don't know who the original creditor was, so you can feel

comfortable knowing you are paying the correct individual…when they can identify the correct creditor."

Plaintiff – "So, but if I'm not able to locate anything, then what do you suggest I do?"

**Angela** - "then you can contact my office back and then I can go to my manager and say…ok… Now, is it something you were wanting to resolve today?"

Plaintiff – Yes, well I'm trying to find out who the people are and then what I owe because I wasn't aware and they are not saying who they are….After pressing the button for the company directories, I am never able to reach anyone…That's why I am just clueless…and I have read about scams."

**Angela** – ".yeah….well when you were in our office, we were never able to touch base with you…so, umm, I would attempt to call to try and call back them."

Plaintiff – "So do you think the other calls are from your office?"

**Angela** – "No, that's why I'm saying, I would have worked with you…but that if you are receiving calls; you obviously have to go that route first"….. "but I do know that this a ***specific account***, that if we had to pull back into our office, we could for you."

Plaintiff – "ok, thank you."

**JS Recovery Conversation – Non-Party**

Additional conversations throughout the day on 09/19/16 rendered the following information and/or conversation:

"JS Recovery – Mark or Mike Marshall – Caller id #202-753-6154, return call #844-281-7673" who initially stated that he could not pull the account after different internal reference numbers were given. Upon further conversation and replaying the message left for the Plaintiff, Mr. Marshall ask to place the Plaintiff on hold for a few moments. When Mr. Marshall returned, he stated the following, "it was forwarded to them (JS Recovery) but it was released back to the other party. So, umm, they will be calling you back, ok. What's a good number to reach you?"

**Plaintiff** – "So you all had it, but it was released back to whomever gave it to you all?

Mr. Marshall – "I'm not sure to be honest with you, I just spoke to my boss and he said that someone would be giving you call back soon to help you/"

**Plaintiff** – "So did you all have the debt because you said initially that you could not find it?"

Mr. Marshall – "Yes, if we did have it, but it wouldn't pull up now anyway. We had it at one point, but it was back released, so whomever you speak to next will be able to help you out", "they will be calling you."

**Plaintiff** – "I'm just trying to find out …if you could not find me on your system, how do you know that somebody else will be calling me back?

Mr. Marshall – "because the phone rang to my business when it was supposed to ring to another business instead, it's like they are linked, you are supposed to be getting transferred over to a different business."

**Plaintiff** – "are you talking about that the 844 number or the 202?"

Mr. Marshall – "honestly, I am not sure what there number is but like I said, I will have one of my representatives give you a call back from the other office."

**Plaintiff** – "will they identify who they are and give me a reference number so that I will know that they are legit…and not anyone just trying to get money."

Mr. Marshall- "just give them the reference number that you have with you, they will be able find it…the 155703, you said it was…they will be able to find it….ok…trust me, just trust me… when they call you, you will understand everything.

**Plaintiff** – "Well, I just want to make sure…because other numbers have call me"

Mr. Marshall – "It may be another company…., but I'm not a 100% positive, he (the supervisor) had to cut me short because he was very, very busy. I'm going to let him know now."

**Plaintiff** – "Will he (supervisor) call me back or who ever got it now?"

Mr. Marshall – "Whoever has it now, possibly him (supervisor), depending on who it has been placed with, I'm not sure…ok?"

**Plaintiff** – "but you don't see anything about it?"

Mr. Marshall – "No, I don't see anything about it"...but somebody will call you back."

**NIC – Steve Anderson – Conversation**

On 09/19/2016 – Plaintiff returned a call to the caller id # of 205-289-3372 and was greeted by a female identified as a Terri Hall – mediator for "NIC – National Information Center." Ms. Hall informed the Plaintiff that there was a debt owed to CashNetUSA for an unpaid payday loan from 2013 that was now pending in litigation with their office. Ms. Hall stated that CashNetUSA was trying to get the Plaintiff in court under a breach of contract with the malicious intent to defraud a financial institution. Ms. Hall questioned whether the Plaintiff was aware of the allegations and the process of pursuit against the Plaintiff. Plaintiff informed Ms. Hall that was she unaware of the litigation due to the limited information left on the messages from different numbers and unanswered calls. Ms. Hall then gave a detailed account of Plaintiff's CashNetUSA account information, including the amount originally owed, Plaintiff's banking information, employer, dates and Plaintiff's social security number. Ms. Hall stated that NIC received the case concerning the breach of contract and stated the CashNetUSA was actually attempting to collect and no one else, for the payday loan applied for in Plaintiff's name and social security number.

Plaintiff then questioned whether NIC was a bill collector in which Ms. Hall replied, "No, and stated that she works in the litigation department that was attempting to collect fund. She further stated that Plaintiff's case was no longer in a state of collection since it was placed in litigation for pursuit with NIC on 08/31/16 and that they were attempting to reach the Plaintiff to inform the plaintiff of the case and offer the ability to resolve the issue prior to litigation in the Court. When Plaintiff attempted to verify who the payee would be, Ms. Hall stated that the funds would be sent over to CashNetUSA since they were representing them in the case. They would accept payment on behalf of CashNetUSA, send the payment over to CashNetUSA and all documentation including the out of court agreement. The debt would be cleared and pending litigation efforts would be stopped.

Although, Ms. Hall stated that the account was in collection for a long period time with the collection agency, she was unable to give the company's name to the Plaintiff when asked. Ms.

Hall was abruptly removed from the conversation during this time and the call was transferred to the "Lead Arbitrator – Steve Anderson" on duty that day. However, prior to transferring the call, Ms. Hall provided an internal case number of **CMB-709** to use when or if Plaintiff called back to pay.

Plaintiff was then transferred to a male identified as Mr. Anderson. When Plaintiff attempted to verify the debt with him, Mr. Anderson informed the Plaintiff of the process associated with the collection phase. Mr. Anderson further stated that the client places the account in collection first and that sometimes the collection company/agency assigned will recycle the documents and make several attempts to retrieve the funds. This cycle would continue until the client decides to hire an attorney to represent them and process the paperwork to get Plaintiff on the court docket. Once that was done, the Sheriff would be sent out to execute a service of process on Plaintiff.

Mr. Anderson could not provide the Plaintiff with the name of the last collection agency although requested; but stated that the account was with NIC because the client themselves (CashNetUSA), placed the account with NIC and not a collection agency due to the agency being unable to retrieve the funds. Mr. Anderson later informed Plaintiff that the court pursuant amount was 2439.72, and that if unpaid, a detainment order would be requested until the payment was made in full versus the current restitution amount owed of 991.00.

Again, Plaintiff then requested information on the validity of debt, including information concerning the breakdown of the charges requested but was told that the case file was the only item NIC had in writing but no complaint was available. The Plaintiff was notified by Mr. Hall, that the court summons which would be delivered by the Sheriff, was all that the Plaintiff could get since it was not in collection but a matter of litigation at this point. As such, Plaintiff informed Mr. Anderson that she did not feel comfortable attempting to resolve the matter, without documentation showing the validity of the debt, breakdown of charges, etc. in which Mr. Anderson replied that the file did not appear in their office "out of thin air".

Plaintiff informed Mr. Anderson that she only was only attempting to follow the path. Before ending the conversation, Plaintiff asked if the company (NIC) was located in Alabama, and Mr. Anderson replied "yes ma'am, maybe 3 or 4 blocks from the courthouse". Plaintiff also asked

Mr. Anderson the name of the company again and Mr. Anderson stated – National Law Center, which was different from the name (National Information Center) given earlier by Ms. Hall.

**Legal Outsourcing – Mr. Bell- Conversation**

During a nearly 30 minute conversation with Defendant John Doe – Legal Outsourcing -Mr. Bell on 09/19/16, Mr. Bell verified the Plaintiff's social security number and the original owner of the debt. Mr. Bell further stated that the balance owed was 887.50, in which Plaintiff responded by asking if Mr. Bell was in collection or litigation. Mr. Bell responded stating in litigation and that they were willing to resolve it for the principal amount borrowed of 587.50, unless I wanted to settle for a lower amount at that time. Plaintiff then informed Mr. Bell of the need for validity of debt and of the previous conversations that had occurred with someone else identifying themselves from litigation and requesting payment. Mr. Bell then repeated additional information from the Plaintiff's account including but not limited to; banking and employment information.

Plaintiff informed Mr. Bell that she was instructed by STP personnel to verify the debt by asking for as much information concerning the account from the collector; prior to payment, since several companies were calling on the account. At that time, Mr. Bell informed the Plaintiff that the account had been placed in their office since September of 2014. He further stated that the last time that his company had really attempted to contact the Plaintiff was on 02/18/16 at 6:24pm. During the call, Mr. Bell stated that an individual voicemail message was left at that time, at the 205-264 # (Plaintiff's work#). Plaintiff questioned the timeframe of the last call since additional calls/messages have been left; after February of 2016, referencing the same internal account number (**155703**) associated with Mr. Bell. Mr. Bell verified the date as the last call physically placed but further stated that the additional calls were ran and made on the **"automatic dialer"**.

Plaintiff again asked about the possibility of additional individuals being involved in collection activities concerning Plaintiff's account. Mr. Bell stated "not on this portfolio because they bought it two years; they got it two years ago, September of 2014." Plaintiff than asked if he was sure that Legal Outsourcing still actively had the account because the other company stated that they had just received the file in August of 2016. Mr. Bell stated that was incorrect and then Mr.

Bell offered to call the other company (NIC) on a conference call to clarify the matter. While in the process of calling, Plaintiff informed Mr. Bell that the company stated they were located in Alabama, in which Mr. Bell disputed by saying they used a device to show that 205 number but wasn't located there.

After company failed to answer during the 1st attempt, Mr. Bell attempted to call again; was placed on hold immediately but was never answered. While on hold with NIC, Plaintiff asked if one collection agency could sell it to another agency. Mr. Bell replied, "no, we purchased it right after CashNet placed it….we purchased it under contract. So that's why I'm really calling, technically I'm calling to see…umm..It's under contract, so they shouldn't even be calling you at all." Mr. Bell later asked if the company informed the Plaintiff how payment could be made. The plaintiff informed Mr. Bell that the conversation never made it that far with Defendant John Doe – Steve Anderson, due to the issue of not being able to validate the debt, which was what STP had instructed the Plaintiff to do.

Mr. Bell then asked "what did STP do when you called, did they give you my telephone number." Plaintiff informed Mr. Bell that STP did not provide a name nor number for the current collection agency holding the Plaintiff's account, and that the Plaintiff had only returned a call to Mr. Bell after listening to an old message left on her cellular telephone from a Michelle. Mr. Bell than asked "what did STP tell you?" Plaintiff informed Mr. Bell that she was told that "it (account) had been sent out, but that they couldn't tell me what agency had the debt, however, if I needed the file to be pull it back for payment, they could pull it back since STP was aware of the issues Plaintiff had encountered in locating the rightful holder of the account presently."

Plaintiff then informed Mr. Bell that STP had suggested calling the companies back first but STP did not provide a name or number. Mr. Bell then informed the Plaintiff that STP should have given Plaintiff his number because Legal Outsourcing purchased the account from STP. In an effort to clarify what was going on, Mr. Bell than called a number for STP that he identified as the owner's –Anthony's direct number. The number rung but later gave a message of disconnected. After verifying STP's consumer number with Mr. Bell, he placed another call to STP on a different number.

At that time, Mr. Bell reached STP personnel and requested to speak with Anthony – the owner. After personnel questioned who was calling, Mr. Bell identified himself as "one of STP's buyers" and Mr. Bell was placed on hold. While on hold, Plaintiff informed Mr. Bell that she felt as though the debt had been resold several times, which Mr. Bell was shocked by.

The call was never taken off of hold for Mr. Bell and Mr. Bell had to call back again; this time reaching STP personnel name Norm. Mr. Bell than asked "for Anthony and questioned where Anthony was at." Norm answered "no" and then questioned who Mr. Bell was and then asked for Mr. Bell to identify himself since he was on his direct line. At that time, Mr. Bell identified himself to Norm and then asked "who was running the floor"; which Norm replied the "same person as always."

Mr. Bell then identified himself again as a debt buyer of Anthony's and asked to speak to the floor manager. A male answered with a name that sounded like "Stephon". Mr. Bell then Stephon look up Plaintiff's original CashNet account 1617217 and the male verified the account was for the Plaintiff, Tiffany Roper. At that time, Mr. Bell instructed STP personnel to take his 4D number down- 844-846-0372 and to have them call Mr. Bell since he had bought the portfolio from Anthony and been contacted by the Plaintiff.

Stephon informed Mr. Bell that was what STP personnel had instructed the Plaintiff to do when she had called earlier in the day on 09/19/16. Mr. Bell then informed Stephon that the Plaintiff had contacted him and during the call; informed him that others (collection agencies) were attempting to collect on the same account. Mr. Bell continued by informing Stephon that the Plaintiff never received his contact information and as result, he was calling to speak with Anthony to see if "Anthony had tried to resale it." Mr. Bell then asked what the account was listed on the account in the computer as being sold as, and Stephon stated I.T.S or I.C.S but claimed not to know what the letters meant. Stephon further stated he wasn't given access to that information. Stephon did not provide STP owner Anthony Stallworth's contact information when requested by Mr. Bell nor advised when he was due back in the office as he was currently out of town.

23. Defendants are aware that Plaintiff's personal and private information, which included Plaintiff's social security number and driver's license number which; could be used for an unlawful purpose if made available to third parties who were known to employ illegal collection tactics and practices.

24. Plaintiff assert that Defendants are aware or should have known, that certain persons and/or entities with whom they have business relationships; have been charged and/or known to commit multiple and systematic violations of federal consumer protection laws, such as the FDCAP 15 U.S.C. §1692 et seq.; Plaintiff further avers that Defendants should have provided adequate and ongoing due diligence with their agents, representatives, clients and/or employees to ensure and maintain compliance within the FDCAP, TCPA and FCC regulations.

25. Upon information and belief, defendants are aware that certain persons and/or entities have remained virtually undetectable by employing tactics and methods to hide their true location and obfuscate their true identities. Plaintiff avers that Defendants and/or their agents, authorized representatives, clients and/or employees utilized methods known as spoofing and blocking to mislead consumers and hide the identities of those employing illegal collection tactics. Furthermore, as described throughout the complaint, debt collector also used Alabama zip code telephone numbers to imply that the company was local and on several occasions, Plaintiff received calls and/or voicemail message from blocked numbers.

25. Beginning in early 2014 and spanning until present, Ms. Roper started to receive on her work phone ending in 8129 - and cellular telephone ending in 6309; a series of calls demanding payment for the alleged debt involving the payday loan by the Defendants, through means known to the Defendants, that violate federal laws.

27. In 2014, after missing numerous calls from an employee and/or agent of the Defendants, Plaintiff answered a call on her work phone from a male that identified himself as "-Mr. Irvin". Mr. Irvin continued with the conversation by stating that the call was concerning a bad check transaction concerning a payday loan to CashNetUsa. During the conversation, "Mr. Irvin" became irate and belligerent while stating that the Plaintiff was violating the bad check laws and had committed fraud by issuing a stop payment on the account. The Plaintiff attempted to inform the caller that he had reached her on her work phone; that she could not receive any further personal calls on and that the stop payments were not intentional. However, Plaintiff was constantly over-talked to. Additionally, the Plaintiff informed the caller that the debt needed validation and that the Plaintiff would not pay until then. This infuriated " Mr. Irvin "and the verbal abuse and threats of jail continued until the Plaintiff inform "Mr. Irvin" that she was not going to pay the debt, instructed him to file the necessary documents for litigation and to not call her anymore about the debt and hung up on Mr. Irvin.

28. Calls continued to Plaintiff's work and cell phone in effort to collect on the debt although Plaintiff informed the debt collector to not call anymore. During a span of over 2 years, Plaintiff avers that the defendants employed the "cutting edge technology" as advertised on their business websites (DMP & STP), when the calls were made using an "automatic telephone dialing system" as defined as 47 U.S.C. § 227(a)(1) and as explained in subsequent FCC regulations and orders. The system(s) used by Defendants had/have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.

29. Upon information and belief, this is evidenced by the fact that on each of these calls, when Plaintiff answered, she was greeted by a period of silence, typically followed by an audible click/beep before Defendant's system would connect Plaintiff to a live representative. Oftentimes, a number would be pressed and no live person would connect. Upon further research, Plaintiff discovered this behavior to be indicative of an **ATDS device** - automatic

telephone dialing system; which was confirmed by the Defendant – Legal Outsourcing - Mr. Bell during a recent conversation on 09/19/16.

30. Upon information and belief, DMP was sold Plaintiff's account identified by CashNet account of #1617217 from CashNetUSA on 02/19/2014. From that point, Defendants DMP, Adam March and Daniel Valentine maintained, held and/or controlled the account for an unknown amount of months until it was sold to Defendants STP, ACDI and Anthony Swatsworth; as reported by a 2014 UCC Financing Statements filed with North Carolina.

31. Upon information and belief, on or about April of 2014 until October of 2014, Defendants STP, ACDI and Anthony Swatsworth co-owned, maintained, held and/or actively supervised and/or participated in collection activities on Plaintiff's CashNet account.

32. On 07/08/14; Plaintiff received numerous calls to her cell phone and work phone from the number listed as 281-249-5313; with the following recorded message on Plaintiff's voice mail: "Hello this message is for Tiffany Roper; Mr. Irvin calling in regarding the legal complaint pending against you at this time. Please be advised that this is my final contact attempt to address this matter and to give me the opportunity to voluntary address this matter outside of legal proceeding. If you fail to return my call by 3 pm CST time today; at that time, I will be signing off on your legal case and you will forfeit all rights to voluntary address this matter outside of legal proceeding and will have to appear in court in front of a judge, in order to address this matter. So if you do wish to voluntary address this to keep it from proceeding to legal, please give me a return call by 3pm CST at 218-249-5313.Thank you."

33. Upon information and belief, the person who left the above-quoted message was an employee of Defendant's STP, ACDI and Anthony Swatsworth, was calling from the call center's workroom floor; at the direction of the Defendants and from scripts created by the Defendants in

their unlawful scheme to extort monies from consumers by threatening legal action and with no intentions of doing so.

34. Upon information and belief, Plaintiff avers that the Defendants, excluding CashNet, continued to own Plaintiff's account but also selected an additional group of in-house 3rd party debt collectors/buyers/sellers from 2014 until November of 2016; who were authorized agents able to assist in the collection of many consumer accounts, including Plaintiff's . The true identity of these entities and individuals are to be identified in discovery, in addition to any contractual agreements between the defendants, known and unknown.

35. On 09/15/14, Plaintiff received a message from a caller id # identified as 877- 885- 6243. The message was received from an auto-dialer system and stated the following; "This message is solely intended for Tiffany Roper. You have failed to respond to previous notifications regarding a lawsuit scheduled to be filed against you under order number 155703. We have now submitted a request to proceed with the filing of this lawsuit, which names you as the respondent. Unless this call is returned immediately, we will assume you wish to waive your legal rights, to resolve this matter. Please be advised, this is a formal notice of intent. If we do not hear from you, we will proceed with the filing of this lawsuit and seeking the appropriate relief. You or your attorney can reach us at 877-885-6243. If a summons is generated for your appearance in court, you will be required to produce two valid forms of identification upon delivery. Good day and Good luck."

36. On 09/17/14 through 01/19/15 – from caller id # 844-845-2144 - calls continued to be made to Plaintiff's work # ending in - 8129 and cell number, ending in 6309. During this time period, additional calls were made that were unable to be logged due to the ATDS systems utilized by Defendants in their call centers which blocked the caller's number from being identified and recorded on the Plaintiff's cellular phone bills. However, Plaintiff was able to record and log over 10 messages from the listed number above; one of many numbers used from the Defendant's caller id system. (see below)

09/17/14- 12:30pm - Messages stated the following: "This message is to notify -----system adds Plaintiff's name ----Tiffany Roper, that our office has obtained information on an authorized check transaction on a verified closed bank account. Our fraud division has been instructed to conduct an investigation due to your actions. We are required by law to give you the opportunity to make statement and protect your rights. In order to stop this action and clear your name, contact the Legal Outsourcing division at 844-845-2144. Ref file number 155703."

9/17/14 - 2:10pm - "This message is intended for ------ (system inputs name) - Tiffany Roper, this telephone number has been listed an emergency contact and character reference in an ongoing investigation that is being preparing to be filed locally and your immediate response is needed. You can receive your important instruction by contacting the Legal Outsourcing Div toll free at 844-845-2144, refer to file #155703."

37. Plaintiff attempted on many occasions to connect to a live representative by pressing one and waiting, when the called was answered but to no avail. Calls continued to be made to the Plaintiff's cellular phone threatening litigation, garnishments, jail and fraud, etc. by the Defendants, and/or their agents, employees, representatives, etc. During the year of 2015, Plaintiff's received over 50 documented, logged calls that continued to harass the Plaintiff. Logged voicemail recordings to Plaintiff's cellular phone listed the following numbers from the Defendant's caller ids #- 844-299-9339, 804-809-8786, 804-809-8789, 844-809-8786, 844-852-9440, 919-229-4576, 844-852-9440 and others unable to be logged. Each call referenced the Defendant's company's file number of 155703.

38. In 2016, Defendant's harassment and illegal debt collection tactics continued through the use of live call center representatives and autodialed robocalls to Plaintiff's work and cellular number. On 01/07/16 @ 11:36am - Defendants left a voice mail message stating the following: - "This call is to inform ---(systems inputs name) - Tiffany Roper, per legal team's request for your file to be pursued under the bad check laws from your state has been approved. Due to your continuous and blatant disregard to this matter, we regret to inform you that you will be found guilty by default; your rights will be waived in this may be resolved without any input from

yourself or any representing council. When responding, please refer to summons number… Your immediate response is warranted. Contact us at 877-228-0244, although the Defendant's caller id showed 919-229-4576.

39. On 2/18/16, Plaintiff received a call from a male identified himself as Johnny Green with the ADG - Arbitration Dispute Group. Upon information and belief, Plaintiff avers that Mr. Green is an authorized agent, employee and/or representative used by the Defendants, as a Collector. Plaintiff further that caller provided a fictitious company name - Arbitration Dispute Group's, which again reference number an internal agency case file number of 155703, the same as the company identified as the Defendants, Mr. Bell's Legal Outsourcing Div. messages. The callback number was again identified as 877-228-0244; with a caller id # of 919-229-4576.

40. Upon information and belief, when failing to collect any monies from the Plaintiffs, Defendants, STP, ACDI, and Anthony Swatsworth employed, reassigned additional agent representatives and/or re-sold Plaintiff's debt to at least two additional agents/debt brokers between 03/16 until 11/16, while debt collections calls were still being made by listed Defendant, Legal Outsourcing - Mr. Bell.

41. From 03/02/16 through 08/16, Plaintiff received numerous harassing calls from a company later identified by the caller as Anderson & Davis or A&D Group, attempting to collect monies on a bad debt involving a payday loan from CashnetUSA as well. Upon information and belief, the Defendants, STP, ACDI and Anthony Swatsworth employed, assigned, reassigned and/or resold Plaintiff's personal information and debt information in further attempts to collect monies from Plaintiff. Plaintiff received over **91 documented**, logged calls/voice mails robocalled messages during this time period. During a live telephone call on 07/22/2016, Plaintiff verified that the debt that referenced by "A&D Group" was the same CashNet debt that the Plaintiff had previously received numerous harassing calls about. The A& D group, referenced the CashNetUsa loan number but presented their internal agency file number of MMW 1031. Additionally, plaintiff again informed a C. J Thompson in the billing department

not to call the Plaintiff any further when he threaten litigation and attempted to extort 977.78 from the Plaintiff.

42. In addition to Plaintiff continuing to receive harassing calls from the Defendants, known and unknown, previously existing co-owners, partners, authorized agents, employees, and debt brokers, etc.; Plaintiff then began to receive harassing collection calls from individuals identifying themselves as a female named Terri Hall with a male supervisor - Steve Anderson, from a company they identified as NIC – National Information Center and National Law Center.

43. On 09/01/2016 & 09/02/2016 & 09/08/2016, Plaintiff received messages stating the following on her cellular phone and/or work phone, "This message is intended for --- (systems puts in recorded name of Tiffany Roper) and you will need to reference claim number 605-574-7596. I'm calling in regards to a formal complaint that's in the process of being filed this morning for several different matters. I'm calling to verify that we do have the correct address for this individual. Now the next step will be filing the necessary paperwork through your County. At this time, you do have the right to contact the Information Center. Should you wish to exercise your rights, there is a contact number listed as CMB-709-…" The called was placed from a call id # 205-289-3372.

44. Additional calls were placed from a series of caller id #'s representing an Alabama originated call to Plaintiff's cellular and work number when the callers/debt collectors were actually located in another state. Some of the additional numbers that was were able to be logged and/or recorded were – 205-203-0877, 205-217-7332, 205-235-8111 & 205-346-6358.

## CAUSES OF ACTIONS

### Count 1 – FDCPA Violations

### 15 U.S.C. § 1692

45. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed and some unknown, and that each of them, violated 15 U.S.C 1692d (6) by failing to provide meaningful disclosure of their identity in their communication with the Plaintiff, specifically the name of the individual collector responsible for the communications and the name of Defendants' company.

More specifically, Plaintiff claims that the debt collectors provided fictitious representative names, in addition to false company names like NIC which was initially stated to mean, "National Information Center" and later identified as "National Law Center."

46. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants, known and unknown, each of them, **violated 15 U.S.C § 1692e (2) (A) through the false representation of— the character, amount, or legal status of any debt;**

More specifically, Plaintiff was told that she owed different amount on several occasions to resolve the matter – 977.78 per the A&D group, 887.50 per Legal Outsourcing and 991. & 2439.72 per NIC.

47. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed as known and some unknown, and each of them, violated **15 U.S.C § 1692e (4) by making false representations that nonpayment will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.**

More specifically…"Jail time and wage garnishment" Plaintiff was threatened with "detention until full payment was made" and possible jail time of several months when is not permitted on a civil case in the State of Alabama. Additionally, threats of possible wage garnishments were also waged against the Plaintiff.

48. Plaintiff re-alleges all paragraphs in this complaint, and set forth herein, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed as known and some unknown, and each of them, violated **15 U.S.C § 1692e (5); The threat to take any action that cannot legally be taken or that is not intended to be taken.**

More specifically, Plaintiff was threatened with litigation and the filing of court documents consistently over a two year span, if matter was not resolved. At the filing of this complaint and upon verification from the Alabama Court system, there were no filings against Plaintiff. Plaintiff was threatened with "detention until full payment was made" and possible jail time of several months as well.

49. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed as known and some unknown, and each of them, violated **15 U.S.C § 1692e (7); false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.**

More specifically, Defendants and their agents, employees and/or representatives accused Plaintiff of violating the "Bad check laws" in Alabama and committing "Fraud on a financial institution" during several conversations.

50. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed as known and some unknown, and each of them, violated **15 U.S.C § 1692e (10); The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.**

More specifically, Defendants known and some unknown, used caller id information to represent that calls originated from the Plaintiff's residential state of Alabama when calls were actually made from several states across the U.S. Caller ids # included but were not limited to area code 205.

51. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed as known and some unknown, and each of them, violated **15 U.S.C § 1692e (11); failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector.**

More specifically, Defendants known and unknown, failed to mini-mirandize Plaintiff when speaking live; when leaving live message or through autodialed recorded robocalled messages. Plaintiff was only advised of the 15 USC 1692e (11) provisions once in nearly two years from any of the Defendants known and those unknown. This lone incident occurred during a conversation between Plaintiff and STP employee Angela on 09/19/16.

52. Plaintiff all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed and some unknown, and each of them, violated **15 U.S.C § 1692e (14); the use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.**

More specifically, the Defendants known and some unknown provided fictitious representative and companies name on many occasions. Upon Plaintiffs belief and information, that this is a common practice in the debt collection industry when employing deceptive, illegal and harassing tactics to collect a debt. During the span of this harassment, Plaintiff has received numerous calls from representatives that identified themselves with the following companies – "Mark Marshall" with JS Recovery Corporation, GL Proceedings Legal Processing, NIC – National Information Center per "Mediator Terri Hall" or National Law Center per Defendant

"Lead Arbitrator Steve Anderson"; "Tim Russo and C.J Thompson" with Anderson & Davis Group or A&D Group, as well as other inaudible company names. Upon belief and information, the names provided to the Plaintiff are fictitious names used by the Defendants are just another tactic used in debt collection when employing illegal and questionable collection tactics. This belief and information through Discovery will be verified as such.

53. Plaintiff re-alleges all paragraphs within this complaint, herein, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants known and some unknown, and each of them, violated **15 U.S.C § 1692f (1) by attempting to collect an amount not authorized by the government, (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.**

More specifically, during a conversation with the Defendants – On 9/19/16, "Steve Anderson" Lead Arbitrator with NIC - stated during a recorded conversation, that the Plaintiff's settlement amount to clear the CashNetUSA.com. Payday Loan and due to CashNetUSA (their clients) would be the current restitution amount of 991.00. However, if case goes to the court; the court pursuant amount is 2439.74 pertaining due to more interest rates, penalty fees, legal fees and court costs.

On 9/26/16, Defendant "Mr. Bell – Legal Outsourcing Div" informed the Plaintiff that the account amount owed concerning the CashNetUsa.com Payday Loan account was 887.50. These amounts are illegal according to Alabama law which does not allow for additional interest to be charged. Furthermore, the Defendants- DMP personnel - Darleen also informed and instructed the Plaintiff that the amount owed was the 587.00 and nothing more should be paid. Plaintiff delinquent debt amount of 587.50 consisted of a 500.00 loan and 87.50 in interest, equaling the 587.50 owed.

54. Plaintiff re-alleges Paragraphs throughout this complaint, herein, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants known and some unknown, and each of them, violated **15 U.S.C §**

**1692c (a)(3) by at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication. Defendants known and unknown also communicated with 3rd parties regarding Plaintiff'**

More specifically, Plaintiff informed Mr. Irvin during a 2014 call that he has reached me on my work phone and that Plaintiff could not discuss personal matters on it. Plaintiff informed other collectors that calls were being made to my work and messages left.

55. Plaintiff re-alleges all paragraphs in this complaint, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants known and some unknown, and each of them, violated **15 U.S.C § 1692c (b) a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.**

More specifically, Defendants made contact calls to an out of state relative's cellular phone in California (925- ) and left messages providing the Plaintiff's name, telephone number and the possibility of litigation, among other things on more than one occasion and thereby continuing the pattern of harassment and embarrassment of the Plaintiff.

56. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that Defendants listed as known and some unknown, and each of them, violated **15 U.S.C 1692d (5) by causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.**

More specifically, Defendants known and unknown, caused Plaintiff's work and cellular phone to ring nearly 200 documented times and many more additional calls that were unable to logged; in an effort to further harass Plaintiff.

57. Plaintiff re-alleges all paragraphs in this complaint, inclusive, and by this reference incorporates the same as though fully set forth herein. Plaintiff is informed and believes and herein alleges that the Defendant – "Mr. Bell – Legal Outsourcing a/d/b/a Legal Outsourcing Div.," violated **15 U.S.C 1692j (A) by Furnishing certain deceptive forms as it is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.**

More specifically, on 09/22/16, after a verbal conversation with Defendant Mr. Bell on 09/19/16, Plaintiff requested a validation of debt showing the information concerning the debt, who held the account and a possible payment plan thereafter; be sent by email to Plaintiff. Additionally on 09/19/16, after Plaintiff contacted Darlene an employee of Defendant – DMP, Plaintiff was instructed to give the other company (Mr. Bell) a few days to send the email with the requested information. On 09/22/16, Plaintiff received an emailed letter identifying the company as Keystone Mediation Group and with a Claims Adjuster listed as a Douglas Pugh III, although the conversation was held with a male that has consistently identified himself to the Plaintiff as "Mr. Bell with Legal Outsourcing".

58. Plaintiff claims in good faith, that the above-described actions and representations made by the Defendants, the Defendant's employees, authorized agents, debt broker and representatives; were false and a part of a scripted and unlawful debt collection practice that is currently ongoing and perpetuated by defendants to coerce the payment of monies from consumers, more specifically the Plaintiff; across the country through the use of false threats of litigation and garnishments, intimidation by threatening jail time and harassment of the consumers, their relatives and other third parties, through continuous and overlapping telephone calls.

59. Plaintiffs avers that Defendant – CashNetUsa.com is a subsidiary of CNU Online Holding, Inc which is a subsidiary of Cash America International and Enova International. With Payday Loan operations throughout the U.S., CNU Online Holding, LLC default accounts continues to increase which causes the company, its subsidiaries, owners and corporate partners/investor to loose monies associated with these default accounts.

According to the Payment Plan Offer Letter dated 11/08/13 and sent to the Plaintiff, Defendant CashNetUsa.com stated that "we will take appropriate collections measures including the use of a third party collections agency or civil court proceedings. However, when Plaintiff later attempted to gain additional information about the defaulted account, Advance America's website identified the account as "loan is in debt collection." The website also stated that the Plaintiff's account had been sold to Debt Management Partners on 2/19/2014 with an outstanding balance of 587.50, leading Plaintiff to believe that DMP was a debt collector, in addition to a debt buyer and debt seller and current holder of the account.

However, Defendant – NIC's Legal Mediator Steve Anderson stated during a recorded conversation held on 09/19/16, "that CashNetUSA had recently regained the file back from collections due to their failure to collect on the defaulted account" and that "the account was recently placed with NIC for litigation purposes." Through discovery, the owners or co-owners of Plaintiff's defaulted account from 11/08/13 to 11/22/16 should be verified, in addition to the operating policies concerning the handling of default accounts during that period; due to the conflicting statements made by Defendants and in an attempt to follow the chain of title.

60. Plaintiff avers that Defendant DMP, is an advertised and reported debt collector, debt buyer and debt seller that has operated and continues to operate a call center for debt collection purposes. According to previous advertisements on DMP's website, DMP's "primary network of outbound call center associates includes more than 700 dedicated professionals nationwide." Additionally the "DMP supports hundreds of call center representatives nationwide, has a dedicated inbound call center, etc." DMP regularly collects or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

Although, DMP has made these statements on its websites, replies to consumer complaints by DMP personnel, appear to contradict reported information about the company. For example,

DMP staff replied with the following regarding a March 2014 complaint to the Better Business Bureau; "I am responding to the complaint we received on May 23, 2014, assigned ID ********. Debt Management Partners, LLC. is not a collection Agency. We buy debt and then place with collection agencies." Another complaint made on 12/30/15 was replied with the following, "Debt Management Partners is not a collection agency and does not make outgoing calls to consumers. We outsource our accounts to collection agencies." Although, DMP consistently denies collecting on bad debts when answering Better Business Bureau complaints, DMP's webpage https://dmpcollections.com/account-holders/; states they accept payments and correspondence concerning accounts at their location at:

Debt Management Partners
200 John James Audubon Pkwy
Suite 102
Amherst, NY 14228
8008839067

61. Furthermore, according to DMP's account holder lookup page, Plaintiff's account was "transferred to STP Management Group," date unlisted. Defendant Anthony Swatsworth and STP's websites advertised its company as having "been providing our creditor partners with a reliable recovery partner since 2011. Our experienced management team and highly trained recovery professionals help our clients to maximize the value of their receivables while reducing risk to their brand reputation. Our team uses cutting edge technology, skilled staff and proven processes to achieve the bottom-line results our partners need. STP Management Group are also active members of DBA International keeping us up to date on the constantly changing accounts receivable management environment."

62. Upon information and belief, the Defendants have maintained, owned, co-owned, co-mingled, employed and fostered a contractual business relationship regarding default accounts owned by the Defendants known and unknown, since prior to 2011.

63. Upon information and belief, at all times material to the Plaintiff's claims; the Defendant's DMP, Adam March and Daniel Valentine had authority from CashNetUSA to arrange with other third parties Defendants, the collection of the Plaintiff's CashNetUSA account and other CashNetUSA accounts. According to CashNetUSA's privacy policy, CashNetUSA may share or sell the consumer's personal information related to the products and services they provide to other companies with whom any CashNetUSA Related company does business with such as collection agencies, as permitted by law.

64. Upon information and belief, the defendant DMP, Adam March and Daniel Valentine also entered into arrangements with the Defendant STP, ACDI Llc, and Anthony Swatsworth to collect on the Plaintiff's CashNetUSA account, and in doing so made them its authorized representative and agent for the collection of the account. The account was listed as transferred to STP and not sold according to the website. During further discovery, the contractual arrangement between DMP and STP would be verified and explained.

65. Upon information and belief, STP, ACDI and Anthony Swatworth entered into additional arrangements, oftentimes simultaneously with other 3rd party brokers through additional debt selling and in-house co-ownership of Plaintiff's account. During the span of Plaintiff's account, numerous others companies, some known and others unknown to Plaintiffs placed collection calls using illegal tactics to Plaintiff's cell phone and work phone. A recorded conversation between Defendant "Mr. Bell" and STP employee – Floor Manager – "Stephon" (Last name unknown) reiterated the debt had been assigned to "Mr. Bell" but also stated it was coded with additional information identified as ICS or ITS, possibly in regards to another agent and/or broker involved in Plaintiff's account. During further discovery, the contractual arrangement between Defendant's STP, ACDI and Anthony Swatsworth and other unknown debt brokers/agents would be identified and verified. Plaintiff also hopes to discover the operating policies concerning the process of default accounts.

66. Plaintiffs asserts that John Doe #2 defendants – Tim Russo & C.J. Thompson reportedly from Anderson and Davis (A&D Group) contacted the Plaintiff and left robocalled message on Plaintiff's work and cellular phone with Defendant's reference of MMW 1031 during a documented timeframe from approximately March 2016 until mid-August of 2016. Additionally, during a recently recorded call between the Plaintiffs and Defendants John Doe – C.J. Thompson, Plaintiff was provided the origination information concerning Plaintiff's CashNetUSA debt but was provided a balance due amount higher than the payday loan was for. The Plaintiff's outstanding balance according to the A&D Group's C.J. Thompson from the billing dept was 977.78, nearly 400.00 hundred more the original debt amount.

Furthermore, Plaintiff claims that Defendant's A&D Group lied about the place from which the call originated when Plaintiff inquired about it. Defendant's informed Plaintiff that they were calling from Alabama since they showed an Alabama caller id number when calling Plaintiff. Through discovery, Plaintiff hopes to determine the contractual arrangements between Defendant's; the A&D Group's true company identification reported and its business relationship identified. *i.e* as a separate 3rd party debt buying entity, co-owner, employee and/or authorized representative or agent of the Defendants.

67. Plaintiffs avers that during the last week of August of 2016, Defendant – NIC – "Steve Anderson" began calling Plaintiff's cellular number and work phones, often times through robocaller devices and/or leaving messages to contact using NIC's assignment file number of CMB-709. During a recorded conversation on 09/19/6, Plaintiff was advised by NIC identified personnel – Mediator Terri Hall and Lead Arbitrator Steve Anderson that Plaintiff's account had been returned back from the other collection agencies due their failure and inability to collect Plaintiff's account. This arrangement was reportedly maintained from approximately September of 2014 to the present. Through discovery, Plaintiff hopes to review the operational polices and guidelines for dealing with defaulted accounts regarding the selling and transferring of such accounts. The contractual arrangement between the Defendants would be reviewed as well.

68. Plaintiff avers that on 09/19/16, Plaintiff was informed by Defendant – "Mr. Bell with Legal Outsourcing" that his company had purchased the Plaintiff's account during September of 2014 from Defendants STP, ACDI and Anthony Swatsworth and still owned the debt. Upon information and belief, defendant "Mr. Bell" entered into an arrangement with STP, ACDI and Anthony Swatsworth and continued to maintain, co-own, and attempt to collect on the Plaintiff's account until as recent as of 11/11/16; and in doing; Plaintiffs assert that Defendant –Legal Outsourcing became an authorized agent and representative for Defendant STP and Anthony Swatsworth, for the collection of Plaintiff's account.

69. The FDCPA's 15 U.S. Code § 1692k - Civil liability - act allows through section A, the ability to collect damages from any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person. As previously described, and upon information and belief, the Defendants have directly or indirectly, entered into agreements and/or arrangement to assist in collections or directly collect, Plaintiff's CashNetUSA bad debt.

70. At all times material to Plaintiff's claims, the defendant CashNetUSA, in conjunction with Debt Management Partners, through its duly authorized representatives, STP, ACDI, Anthony Swatsworth and John Does; entered into arrangements with each other defendant STP and Anthony Swatwsorth to collect on the Plaintiff's CashNetUSA account, and in doing so made them its authorized representative and agent for the collection of that account. Amounts recovered by those defendant debt collectors on debt collections conducted pursuant to arrangements with DMP were remitted to the DMP, including amounts recovered by in-house agencies. As such, Plaintiff avers that in doing so, the liability under the FDCPA of the other defendant debt collectors for the violations described throughout the Plaintiff's complaint is imputed to Defendants - CashNetUSA, DMP, Adam March, Daniel Valentine, STP, ACDI and Anthony Swatsworth, thereby making those Defendants liable under the FDCPA for those violations, as a matter of law either under the federal common-law principles of agency or under general rules of agency law. *Pollice v. National Tax Funding, L.P., 225 F.3d 379, 404–06 (3d Cir.2000); Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507, 1516 (9th Cir.1994). ("A debt*

*collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself.)*

71. Plaintiff further avers, that an entity that itself meets the definition of debt collector is liable for the unlawful collection activities described and reported throughout Plaintiff's complaint and carried out by another debt collector on its behalf. *Pollice v. National Tax Funding, L.P., 225 F.3d 379, 404–06 (3d Cir.2000); Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507, 1516 (9th Cir.1994). ("A debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself.)*

72. Under general rules of agency law, a corporate officer or director's personal liability "must be 'founded upon specific acts by the individual director or officer'." Roylance v. ALG Real Estate Servs., Inc., Case No. 5:14-cv-02445-PSG, 2015 U.S. Dist. LEXIS 44930, at *19 (N.D. Cal. Mar. 16, 2015) Furthermore, a shareholder, owner, officer, member, manager, employee or agent of a corporate debt collector can he held liable for violating the FDCPA, without piercing the corporate veil, by being directly involved in the companies daily operational activities, including but not limited to the training and managing of employees, reviewing, assigning or supervising of account, materially participating in the activities of the company, supervising of collection activities, overseeing the compliance with applicable collection laws, indorsing of unlawful acts, in such that each individual is a considered to be a "debt collector" within the statutory definition – that each is "person" in a business, with "the principal purpose of which the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C § 1692a(6). *See Kistner v. Law Offices of Michael Margelefsky, LLC, 518 F.3d 433, 435-438 (6th Cir. 2008); Russell v. Goldman Roth Acquistions, LLC, 847 F.Supp.2d 994, 1004-06 (W.D.Mich. 2012)*

As such, Plaintiff avers that the Defendant Anthony Swatsworth is liable for the actions of his employees, co-owners, representatives and/or agents; in addition to the 3rd party debt buyers/brokers he contracted with. As previously mentioned in this complaint, Defendant

Anthony Swatsworth is the owner, manager and agent of Defendants STP and ACDI. He is also considered to be a debt-collector as defined as under FDCPA. Plaintiff claims with good faith, that Mr. Swatsworth was directly involved in the day to day operations of STP and ACDI. He is responsible for the assignments and/or sales of portfolios as reported by Defendant John Doe – Legal Outsourcing – Mr. Bell and STP employees – "Angela" and "Stephon".

To reiterate, on 09/19/16, Mr. Bell stated that he purchased Plaintiff's account from Mr. Swatsworth during the latter part of September of 2014. This was verified by Stephon. Additionally, "Angela" informed the Plaintiff that Plaintiff's account could be pulled back from the other agencies, if Plaintiff needed or wanted to resolve the matter. However, the pulling back of portfolios was an "upper management" ability, once notified. Furthermore, "Stephon" stated that Defendant Anthony Swatsworth was responsible for the placement of portfolios (assigning, sales, reassigning activities), etc when Mr. Bell inquired as to whom (agency) was listed in the computer for the Plaintiff's account. "Stephon" immediately stated that "Anthony was the boss", "he was in charge of that of area" and that he "did not know what the code – I.T.S or I.C.S" meant, since Anthony oversaw this.

The process of collection was explained in more detail by Defendant John Doe – NIC – "Steve Anderson" when he informed the Plaintiff that during the collection phase involves the client assigning the file to a collection company or agency, then the agency may or will recycle the file documents, make attempts to retrieve the funds, and if funds are not retrieved by that agency, the client resends it to another collection agency and the cycle may or may not continue. As such, Plaintiff asserts that Defendant Swatsworth exercised control over Plaintiff's account and the collection agencies he selected and was involved as he either assigned, reassigned, and/or sold Plaintiff's account. As previously reported, Defendant Anthony Swatsworth could pull a file back for payment, if needed.

**TCPA Violations - 47 U.S.C § 227**

73. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

74. The TCPA regulates, among other things, the use of automated telephone dialing systems.

75. 47 U.S.C § 227(a)(1) defines an automatic telephone dialing system ("ATDS) as equipment having the capacity -

a. – store and produce telephone numbers to be called, using a random or sequential number generator; and

b. - to dial such numbers.

76. More specifically, 47 U.S.C § 227(1)(A)(III) prohibits any call using an ATDS or an artificial or prerecorded voice to a cellular phone without prior express consent by the person being called, unless the call is for emergency purposes.

77. In addition, according to the Federal Communications Commission ("FCC"), such calls are prohibited because automated or prerecorded telephone calls are a greater nuisance and create a greater invasion of privacy than live collection calls. Furthermore, wireless customers are charged for incoming call.

78. In January of 2008, the FCC released a Declaratory Ruling: *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R 559, 556; wherein it confirmed that autodialed and prerecorded calls to a wireless number by a creditor, or on behalf of a creditor, are permitted only if the calls are made with the "prior express consent" of the called party.

- Upon review of the CashNetUSA – Terms of Use and Privacy Policy effective 1/17/14 during which time, Plaintiff's account was in default, Plaintiff claims that prior express consent to received autodialed and prerecorded calls through and/or from an ATDS system was never granted to CashNetUSA or any of its affiliates or non-affiliated third parties; nor expressed by CashNetUSA anywhere in the policies governing during Plaintiff's loan. According to the "Our Right to Contact You" section of the privacy policy, CashNetUSA "reserves the right to contact you regarding your account status and changes to subscriber agreements, our Policy, or any other policies or agreements relevant to you. By visiting our websites, you understand and agree that

we may contact you at the phone number or email address you provide to us through our websites or on your transaction agreements, applications, loan documents or any other document to assist you with your products and services that a CashNetUSA Related Company may provide for you. Plaintiff argues that at no point was consent given, express or implied to or that contact to Plaintiff would or could be made using an ATDS device to Plaintiff's cellular phone, in which the Plaintiff incurred charges for. Therefore, prior express consent was not given to any of the 3rd parties involved in Plaintiff's claim.

Plaintiff further avers that during that time, CashNetUSA did not assume that prior express consent to be contacted (through an ATDS device) had been granted nor was automatic by merely providing a number on a loan during the origination of Plaintiff's loan. This is evidenced by the very specific and far-reaching changes to CashNetUSA's Terms of Use or Privacy Policies from 2014 to 2016. As previously mentioned, the 2014 Right to Contact section failed to identify contact could or would be made through a possible ATDS device to a cellular number. However, CashNetUSA's 2016 "Consent to be Contact" section specifically states and gives expressed consent for consumers to be contacted through "written notices, emails messages, text messages, or telephone"....we have for you in the records or from other public and nonpublic databases we may lawfully accessed, and in connection with any such telephone calls; you consent to use of prerecorded/artificial voice messages and/or automatic dialing devices, at any telephone number associated with your account, including mobile telephone numbers"...As such, a redraft nor specification of CashNetUSA's 2016 Right to Contact policies would not have been warranted but for, to clearly inform that express consent is automatically imputed by using CashNetUSA's services.

79. The FCC revisited the act on July 10, 2015 when it issued FCC Order 15-72, wherein the FCC stated "a caller may not limit the manner in which revocation (of prior express consent to call) may occur" and that **the burden is on the caller to prove it obtained the necessary prior express consent":** *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC docket No. 07-135...

- As previously mentioned and referenced in throughout complaint, Plaintiff instructed the caller that she could not and would not be paying the debt in question; to proceed with whatever was going to happen and to not call her again; after caller failed to provide a validity of the debt in

writing and identify the account owner after he became verbally abusive towards the Plaintiff. Throughout this 2 year span, Plaintiff has been provided with fictitious information regarding the true identity and name of the companies, as evidenced in recorded calls, voice mail messages left and in the spoofing and/or blocking of caller id #s from those collectors. As such, Plaintiff was unable to provide a written revocation of consent to any account holder due to the callers withholding true and verifiable identification of Plaintiff's account holder.

According to 15 U.S. Code § 1692g - Validation of debts (a) - **Notice of debt;** Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice…As such, Plaintiff asserts that each new debt collector should have validated the debt, especially when requested. *Griswold v. J & R Anderson Bus. Servs., 82-1474, 1983 U.S.Dist. LEXIS 20365, *2-4 (D.Ore.Oct. 21, 1983); Robinson v. Nationstar Mortgage, LLC, Case No. 2:12-cv-718, 2012 U.S. Dist.LEXIS 163268, 2012 WL 5596421 (S.D.Ohio, Nov. 15, 2012); Turner v. Shenandoah LegalGroup, P.C., 3:06cv045, 2006 U.S. Dist. LEXIS 29341, *32-39, 2006 WL 1685698, *11 (E.D.Va.June 12, 2006); Tipping-Lipshie v. Riddle, 2000 WL 33963916, *3 (E.D.N.Y. March 2, 2000);Sparkman v. Zwicker & Assoc., P.C., 374 F.Supp.2d 293, 300-01 (E.D.N.Y. 2005); Stair v.Thomas & Cook, 254 F.R.D. 191, 197 (D.N.J. 2008) – (The FDCPA…" however, makes apparent that section 1692g's notice requirements apply equally to the initial communications of first and subsequent debt collectors. Manzella, 475 F.3d at 157)*; "**Otherwise, the consumer has no opportunity to insist that collection efforts cease, pending verification in situations where that is clearly required to protect the consumer,** such as: (a) when there is a **question whether the new debt collector has an assignment of the debtor is otherwise authorized to act,** as in *United States v. Goldberg, 09-80030-CR (S.D.Fla.)* (In 2009, a debt buyer was charged with a scheme to sell 86,000 accounts that he did not own.); or (b) **when collection efforts by two or more debt collectors who claim to have been authorized to collect the same debt occurs**, as in *Wood v. M&J Recovery LLC, No. CV 05-5564, 2007U.S.Dist. LEXIS 24157 (E.D.N.Y. Apr. 2, 2007)* (a debtor complained of multiple collection efforts by various debt buyers and collectors on the

same debt, and the defendants asserted claims against one another disputing the ownership of the portfolio involved); as reported within this complaint.

80. Further, consumers (like the Plaintiff) may revoke consent through any reasonable means. ": *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*. Plaintiff affirms that consent was revoked verbally.

81. Nothing in the language of the TCPA or its legislative history supports the notion that Congress intended to override a consumer's common law right to revoke consent. *Id.*

82. Consumers have a right to revoke consent, using any reasonable method including orally or in writing.

## ALLEGATIONS APPLICABLE TO ALL TCPA COUNTS

83. Within the four years prior to the filing of this complaint, the Plaintiff received numerous calls from the Defendant to her cell phone.

84. Upon information and belief, Defendants employ an automatic telephone dialing system (ATDS) which meets the definition set forth in 47 U.S.C. § 227(a)(1), to make those calls.

85. Defendant or its agent/s contacted Plaintiff on Plaintiff's cellular telephone ending in "6309" via an ATDS as defined by 47 U.S.C. § 227(a)(1), as prohibited by 47 U.S.C. § 227(b)(1)(A), numerous times.

### TCPA Violations of 47 U.S.C. § 227(b)

**Restrictions on use of automated telephone equipment**

86. In February of 2014, the Defendant – CashNetUSA collection representative, reached the Plaintiff by calling her work phone after Plaintiff failed to answer her cellular number. While speaking with the CashNetUSA representative, the Plaintiff was informed that the call was concerning a CashNetUSA payday loan debt in which the Plaintiff had defaulted on previously in November of 2013. The representative continued on with the conversation about collecting on the debt and then began to imply that the Plaintiff had intentionally planned to default on the loan when there were insufficient funds and when the Plaintiff later closed the account. The Plaintiff replied to the representative that the account was not closed but stop payments were issued due to various times and amounts that were attempted to be taken from the Plaintiff's account, at random times; thereby causing the Plaintiff to incur many NSF charges.

The representative appeared to not care about the Plaintiff's financial issues/reasons nor engage in other conversations outside of payment method to be received for the debt owed. He later became more irate when the Plaintiff questioned the amount owed and the validity of the debt and requested info concerning such. Plaintiff eventually became more upset with the representative as well, due to the amount of time the call was taking (Plaintiff was on work phone) and the repetitiveness of the conversation. As such, Plaintiff informed that representative that he had reached the Plaintiff on her work phone and that she could not continue the conversation any further, while at work for personal matters. However, the representative attempted to continue the conversation, while making threats until the Plaintiff instructed the representative that she would not be paying the debt and to never call the Plaintiff again.

87. Although Plaintiff informed the Defendant(s) that payment could and would not be paid and to not call her again described in the aforementioned paragraph, the Plaintiff's requests and thereby, revocation of consent went ignored. The defendant(s) and/or their representatives continued to place calls without consent while using an ATDS in violation of the TCPA, nearly 200 documented times from 2014 to November of 2016, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

88. Upon information and good faith belief, Defendants were responsible for the numerous violations of 47 U.S.C § 227 (b) *et seq*, either directly or indirectly, through their representatives, agents, employees, clients, customers, etc. when the numerous calls were made to the Plaintiff's Verizon cellular telephone number ending in 6309; for non-emergency purposes and without consent; with intentions to use an automatic telephone dialing system to place the calls at issue to Plaintiff's cellular telephone number; when leaving voice messages on Plaintiff's cellular telephone voicemail service; consuming, directly or indirectly, cellular telephone minutes for which the Plaintiff paid a third party and when tying up the Plaintiff's cellular telephone while making more than 200 calls to the Plaintiff's cellular phone. The following calls were able to be verified and documented through voicemail messages.

**2014 = 16 total documented calls**

- July 2014 – total of 4 calls from 281-249-5313
- September 2014 – 3 calls from the following numbers – 281-249-5313; 2 calls from 844-845-2144 = total 5 calls.
- October 2014 – 7 calls from 844-845-2144

**2015 = 36 total documented calls**

- January 2015 – 1 call from 844-845-2144 and 2 calls from 844-299-9339 = total of 3
- February 2015 – 4 calls from 804-809-8786; 2 calls from 804-809-8789; 1 call from 844-809-8786 = total of 7
- March 2015 – 7 calls from 844-809-8786
- April 2015 – 6 calls from 844-809-8786
- May 2015 – 2 calls from 844-809-8786
- June 2015 – 2 calls from 844-809-8786
- July 2015 – 2 calls from 844-852-9440
- August 2015 – 3 calls from 844-852-9440

- October 2015 – 3 calls from 844-852-9440
- November 2015 – 2 calls from 844-852-9440

**2016 = 126 total documented calls**

- January 2016 – 1 call from 919-229-4576
- February 2016 – 3 calls from 919-229-4576, 1 call from blocked number = total 4 calls
- March 2016 – 6 calls from 866-391-4672, 1 call from 888-226-0570; 6 calls from 205-217-7332, 1 call from 844-819-6199, total = 14 calls
- April 2016 – 1 call from 888-226-0570, 12 calls from 205-217-7332, 2 calls from 844-819-6199, 3 calls from 205-203-0877, total = 18 calls
- May 2016- 13 calls from 205-203-0877
- June 2016 – 11 calls from 205-203-0877, 1 call from 202-753-6154, 6 calls from 205-235-8111 = total of 18 calls
- July 2016 – 7 calls from 205-203-0877, 7 calls from 205-346-6358, 1 call from 866-391-4672, 1 call from 844-309-3861, total of 16 calls
- August 2016 – 12 calls from 205-346-6358, 1 call from 844-307-2009, total of 13 calls
- September 2016 – 2 calls from 205-346-6358, 3 call from 205-289-3372, 5 calls from 844-846-0372, total of 10 calls
- October 2016 – 12 calls from 844-846-0372, 1 call from 844-347-4005, total of 13 calls
- November 2016 – 3 calls from 844-846-0372, 1 call from 844-347-4005, 2 calls from 205-203-8941, total of 6 calls

89. In addition, many more calls were made to the Plaintiff but recorded voice mails were not left and could not be documented due to a blocking/spoofing technology employed in their call centers and sold by the Defendants DMP, Adam March and Daniel Valentines to other collection agencies. On 2/25/15, 02/18/16 and 04/19/16, collection calls were made to Plaintiff s cell phone with the caller id information blocked.

**TCPA Violations of 47 U.S.C. § 227(e)(1)(2) & 47 C.F.R.64.1604**

**Prohibition on provision of inaccurate caller identification information**

90. According to the *DISH Declaratory Ruling, 28 FCC Rcd at 6583, para. 26*; The FCC recognized that sellers could "be held vicariously liable for certain calls made by third parties, "or violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification". CashNetUSA's privacy policy recognized the relationships tht

91. Plaintiff pulled cellular phone records for approximately two years and none of the calls made to the Plaintiff's cellular number were logged and/or listed on Plaintiff's Verizon cellular bills. As such, Plaintiff avers that Defendants utilized ATDS calling devices that intentionally blocked the information from being recorded; thereby making it untraceable and unverifiable to for most consumers. That withstanding, deters and/or prevents consumers from filing complaints and/or lawsuits against debt collectors that employ illegal collection methods, since their proof would be comprised. Plaintiff asserts that but for the recorded voice mail message information provided and kept for nearly two years on the Plaintiff's current phone, by the Plaintiff, proof of the innumerable amount of calls.

It is important to note, that additional saved voice mail messages left from other parties and near the time of the collection calls, were logged on Plaintiff's cellular bill. The Defendant's ATDS systems used in their "international debt purchaser and management company", have been described, advertised and sold as "cutting edge technology" on the STP Management Group's website. Additionally, DMP's ability to be a market leader continues to grow by utilizing "Coded Logistics, DMP's technology arm, has developed a proprietary software suite", as well per DMP's company website. Upon information and belief, the technology employed by the Defendants, was intentionally used to allow for the blocking and spoofing of caller id numbers in an effort to mislead and prevent the true identification of the debt collector; as witnessed by the Plaintiff.

92. When considering the issue of vicarious liability; the FCC when attempting to address the issue regarding the initiation of the call, have establish specific factors to be considered in determining who makes or initiates a call. The FCC has recognized that to "initiate" suggests some "direct connection between a person or entity and the making of a call." In the 2015 FCC's, Declaratory Ruling and Order – FCC 15-72, Dockets CG Docket No. 02-278 & WC Docket No. 07-135; the FCC look to the "totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA."

Furthermore, the FCC stated on this order that they identified "factors that are relevant to the DISH Declaratory Ruling analysis. Depending upon the facts of each situation, these and other factors, such as the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller ID, by offering either functionality to clients, can be relevant in determining liability for TCPA violations. Similarly, whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them.

More specifically, **47 U.S.C. § 227(e)** ("It shall be unlawful for any person within the United States . . . to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value . . . ."); **47 C.F.R. § 64.1604** (mirroring the language of 47 U.S.C. § 227(e)); **47 C.F.R. § 64.1601(e)** ("Any person or entity that engages is telemarketing . . . must transmit caller identification information . . . (2) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.")

93. As such and upon information and belief, Plaintiff claims the Defendants violated directly and indirectly, the aforementioned sections of the TCPA and FCC as listed and alleged in this complaint on numerous occasions. As previously mentioned, the Defendants known and

some unknown, either directly or indirectly, through their representatives, agents, employees, clients, customers, etc. employed the practice of the spoofing of telephone number and blocking of Caller IDs.

94. More specifically, Plaintiff received 18 documented calls from a Caller ID # 205-217-7332 from 03/14/16 – 4/25/16. Through thorough research, Plaintiff was later notified that the calls were made from a company who identified themselves as Anderson & Davis Group or A&D Group. During the conversations with a male identified as Tim Russo and later a C.J. Thompson, Plaintiff was informed that the calls were regarding a bad debt owed to CashNetUSA and had an interoffice case file number of MMW1031. The company was not located in Alabama although the caller id's area represented an Alabama telephone number.

95. From 04/26/16 – 06/17/16, the Plaintiff received 27 documented voice mails left through an ATDS from the Anderson & Davis Group or A&D Group from a Caller ID # of 205-203-0877 threatening pending litigation. Company was and/is not located in Alabama.

96. From 06/21/16 – 07/13/16, the Plaintiff continued to receive voice mail calls utilizing an ATDS representing an Alabama number of 205-235-8111, 14 times. The Anderson & Davis Group or A&D Group were identified as the caller, left message about charges being filed and were at no time located in Alabama.

97. From 07/14/16 – 09/21/16 – 21 calls were left from an ATDS device showing a Caller ID # as 205-346-6358. The calls were from the agency identified themselves as the Anderson & Davis Group or A&D Group and again represented a call origination of Alabama when they were and are not located in Alabama. The messages again reference their case file number of MMW1031.

98. Starting from 09/01/16 and lasting until 09/19/16, the Plaintiff received at least 5 verified and documented calls and voice mails message from the Caller ID # of 205-289-3372. Upon information and belief, Plaintiff claims the calls were made from an ATDS device and voice mail messages were left threatening litigation. Furthermore, when Plaintiff returned the call, Plaintiff was informed that the agency calling identified themselves to be NIC – National Information Center and National Law Center by two of the representatives. The Defendant verified that the calls were concerning a debt owed to CashNetUSA that defaulted in 2013 and that they were in the litigation department of the company. The Defendant referenced their inter office agency assigned file number of CMB-709, which was the reference number left on the Plaintiff's work, cell phone and an Out of State relative's cellular telephone twice in regards to the Plaintiff's debt and possible litigation.

**Liability & Respondeat Superior**

99. The FCC Declaratory Ruling – FCC 13-54; adopted on April 17, 2013 and released on May, 9, 2013 involving Docket CG Docket No. 11-50; reported that potential liability under general agency related principles extends beyond classical agency definition. "A principal may be liable in circumstances where a third party has apparent (if not actual) authority. Such "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Vicarious liability in the context of the principal-agent relationship means an imposition of responsibility on the principal on the acts of the agent.

100. Furthermore, the FCC ruled that as an example, "a seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits." Upon information and a good faith belief, Plaintiff claims the Defendants did in fact, accept the benefits from the business partnerships created amongst the Defendants. Benefits such as the continuation of current business and the opportunity for additional new business opportunities. With this growth, Defendants have the opportunity to maintain their current

revenue stream and invest in other sectors of the debt collection business; while creating additional avenues of revenue or income for the Defendants, personally and for their businesses.

101. As such, CashNetUSA benefits from partnering with DMP, Adam March and Daniel Valentine when they make any amount of monies from the selling of those defaulted loan portfolios. By selling defaulted loans, CashNetUSA is able to minimize their losses from the defaulted loans, which benefits CashNetUSA and its shareholders. CashNetUSA could not be concerned with the alleged tactic used by the Defendants DMP, Adam March and Daniel Valentine or reported violations of FDCPA and TCPA laws against them alleged in many civil lawsuits over the past few years.

According to DMP's website – dmpcollection.com, "DMP aims to bring our success in account management to lenders in order to ease their internal account strategies and increase their yield." In addition DMP advertises to, "Sell your delinquent accounts, earn returns today, and watch our professional brand management focused team convert your delinquencies back into future borrowers"; the benefits of doing business with DMP.

102. The Defendants DMP, Adam March & Daniel Valentine willingly accepted the benefits; such increased business opportunities, increased revenue and increased income as well, from engaging in business partnerships with the other listed Defendants. More specifically, after becoming an authorized debt buyer from CashNetUSA and others, the defendants were able to improve their brand by opening and/or assisting in opening new agencies and through increase revenue from the re-sale of those CashNetUSA accounts and others, who failed to meet the criteria for a 1st party purchase of such debt. By offering other lower rated debt buyers the opportunity to purchase these portfolios (when unable prior to the Defendants partnership with DMP), DMP was able to increase their revenue even more from the increased portfolio sales to current partners and the increase in new debt collection agencies opening. DMP also advertises portfolio management as well as sales.

103. Defendants STP, ACDI, llc and Anthony Swatsworth has also benefited from the acts and/or violations from other Defendants known and unknown. Defendants have had an ongoing business relationship with DMP, Adam March & Daniel Valentine. This was verified when the Plaintiff was instructed to contact STP about her defaulted CashNetUSA account. Upon information and good faith belief, Plaintiff claims that all of the defendants have continuously benefited from their business relationships with each other, regardless of the acts that the Defendant that have been alleged to have participated in, directly or indirectly, that may have violated FDCAP and/or TCPA laws.

DMP made the following statements to the BBB after investigations were opened concerning complaints of illegal debt collections practices: "As of **July 1, 2014**, DMP has made significant changes to its infrastructure to ensure better operational business processes which include quality assurance and compliance. See the following changes to the business:

- Hired a Chief Operating Officer to manage all the new processes.
- Hired an Agency Manager who reports to the COO, to enforce compliance among the collection agencies.
- Hired a CPA Firm to assist in the development and writing of our internal policies and procedures that are aligned with the expectations of the Consumer Financial Protection Bureau.

Re-contracted with all of our collection agencies. New Language provides stricter consumer protection, including immediate termination of the agency, if violations of the law and/or consumer abuse are found.

Terminated agencies who generated high levels of complaints and replaced those agencies with collection agencies who share DMP's view on compliance."

104. However, upon information and good faith belief, Plaintiff claims that DMP has failed to seriously address the complaints of illegal debt collection tactics employed by its 3rd party debt buyers, employees, and agents. Initially, upon making the published BBB report, DMP reported the hiring for different executive positions but failed to hire a Chief Compliance Officer until late November of 2015. Additionally, DMP stated that they also re-contracted with their "collection agencies" which signifies a business relationship or some form of partnership with these

companies. Lastly, through discovery, DMP's quality control and compliance review procedures for follow-ups of their collection agency client's compliance efforts, should be provided, in addition to a list of the terminated agencies by DMP, Adam March and Daniel Valentine.

105. More specifically, Defendant STP, ACDI LLC and Anthony Swatsworth have benefitted financially from their ongoing partnerships/business relationships with their employees, co-owners, agents and/or other debt buyers such Mr. Bell with Legal Outsourcing, NIC, Anderson & Davis Group, to name a few. As such, the other Defendants, as advertised on the STP Management Group's website, have been able to "to maximize the value of their receivables while reducing risk to their brand reputation." In essence, each Defendant known and unknown, that has allegedly purchase bad debt portfiolios, and has entered into a contractual business agreement; benefits from the increased revenue stream that results from the ability to add additional portfolios. It is important to note, that CashNetUSA has specific criteria to qualify as an approved debt buyer of their assets. As such, lower rated collection agencies are otherwise unable to purchase certain portfolios of bad debt directly from the original creditor and have to depend on debt buyer/debt sellers such DMP and STP.

106. Furthermore, in return, STP, ACDI and Anthony Swatsworth benefited by fostering their brand from the increases in new collection agency openings; regardless of the consumer reported illegal tactics used by these new agencies and reported in public. Upon information and good faith belief, Defendants STP, ACDI and Anthony Swatsworth has benefited further from the increase in revenue obtained from the double selling and/or assigning of previously sold portfolios by STP and Anthony Swatsworth to other partnering debt buyers and debt brokers. Increased beneficial opportunities also have occurred for STP, ACDI and Anthony Swatsworth when accepting payments to resolve the debt. An additional processing fee is added to each payment made through an ACH draft, which increased revenue.

## Direct and Vicarious Liability Arguments

In 2013, the FCC issued its Dish Network Order, which was affirmed earlier this year by the D.C. Circuit, concluding that the TCPA also allows sellers to be held vicariously liable for the conduct of their third-party agents making telemarketing calls. See In re Joint Petition filed by Dish Network, LLC, 28 F.C.C.R. 6574 (2013); aff'd, Dish Network L.L.C. v. FCC, 552 Fed. App'x 1 (D.C. Cir. Jan. 22, 2014). Although "a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." Dish Network Order.

107. As mentioned throughout Plaintiff's complaint, CashNetUSA provided Plaintiff with a payday loan after obtaining Plaintiff's personal and financial banking from their online Advance America website as part of the online transaction. After Plaintiff's account went into default, CashNetUSA reportedly sold Plaintiff's account to an approved debt buyer (DMP) who met CashNetUSA's specific debt-buyer criteria. An amended complaint to include but not be limited to; CashNetUSA's application and selection process requirements for debt buyers will be provided after discovery.

Plaintiff asserts that during the time of Plaintiff's loan, CashNetUSA's Privacy Policy, stated that the consumer's account information would be used to "*process payments and update account records, comply with all reporting and other legal requirements*" among other things. It also stated that consumer information could be shared with ...."*financial service providers, loan brokers....collection agencies, consumer reporting agencies, financial service provider holding companies, or agents, contractors, or representatives of any of the foregoing*" for any **legal purpose.** However, Plaintiff avers that the information provided to CashNetUSA's Non-Affiliated Third Parties was used for illegal purposes of attempting to extort monies from Plaintiff as previously mentioned in the complaint.

Moreover, Plaintiff claims that the Defendant CashNetUSA had a fiduciary responsibility to Plaintiff in regards to the protection of Plaintiff's personal and financial banking information and from an invasion of privacy; created when Plaintiff's information was retailed around the country to unethical debt collectors, exposing Plaintiff to repeated and possible future harm. Plaintiff

further claims that CashNetUSA failed to engage in ongoing due diligence efforts to ensure compliance within FDCPA, TCPA and FCC regulations among their initial debt buyer and should be held liable vicariously. Defendants DMP, Adam March and/or Daniel Valentine or subsequent debt brokers; while failing to preclude "*the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence*" was reposed. Plaintiff claims that CashNetUSA could not nor are concerned with the alleged illegal tactics involving debt collection activities, either directly or indirectly; by the Defendants DMP, Adam March and Daniel Valentine. CashNetUSA continues to conduct business as usual, regardless of the numerous documented reports of FDCPA, FCC and/or TCPA violations against them; in addition to; Defendants DMP, Adam March and Daniel Valentine.

At the filing of this complaint, 11 consumer complaints had been filed against DMP within a 12 month period with the Consumer Financial Protection Bureau "CFPB" regarding illegal collection tactics activity. Furthermore, Defendants DMP, Adam March and/or Daniel Valentine have been defendants in numerous civil lawsuits concerning violations of FDCPA and/or TCPA regulations over the past few years. According to the U.S. Pacer Court system database, Defendant Adam March has been a defendant in over 40 debt collection lawsuits (most which settled) in the past few years. These in suits typically listed DMP as a party and other collection agencies that he either owned, managed and/or have a financial interest in; such as Aubudon Financial Bureau LLC – a wholly owned subsidiary of DMP *a/d/b/a* as ARM WNY LLC, Apex Recovery Holding LLC.; to name a few.

Furthermore, DMP co-owner Daniel Valentine has also been a defendant in many civil lawsuits alleging illegal debt collection tactics from collection agencies that he either owned, managed and/or shared a financial interest in; such as Aubudon Financial Bureau LLC – a wholly owned subsidiary of DPM *a/d/b/a* ARM WNY LLC; Apex Recovery Holding LLC and DMP. It is important to note that Aubudon Financial Bureau (AFB) was wholly owned by DMP and collected on loans, on behalf of DMP; *(13-258 - Sweet et al v. Audubon Financial Bureau, LLC et al)* and was shut down after the Federal Trade Commission file the stipulated order for permanent injunction after a 3-0 voted for using deceptive and abusive collection practices in their debt collection businesses. The U.S. District Court for the Western District of District of New York entered the order on August 26, 2016. It is important to note, that despite the many

allegations and/or complaints lodged against Defendant's DMP, Adam March and Daniel Valentine's; couple with their involvement in the 2013 Audubon case, CashNetUSA has continued to allow their Defendants partners to purchase portfolio accounts from them.

DMP's strategy "to bring our success in account management to lenders in order to ease their internal account strategies and increase their yield, as well as convert delinquencies back into future borrowers", are the benefits of doing business with DMP; which is what CashNetUSA received. As such, Defendant CashNetUSA should be held vicariously liable for violations of TCPA and FCC acts, herein, due to negligent hiring or supervision of a collection partner such as DMP.

108. Plaintiff incorporates by reference all of the above paragraphs of this complaint as though fully stated herein. Defendant DMP is owned by Defendants Adam March and Daniel Valentine, who are also managing members of DMP. As previously mentioned, Debt Management Partners, Mr. Valentine and Mr. March are in the business of purchasing delinquent consumer loan accounts, at a discounted rate from companies such as CashNetUSA. For many years, DMP, its agents, authorized representatives and/or owners Mr. Valentine and Mr. March, would directly engage in the debt collection practices but more recently have reported themselves to be a debt seller and not a debt collector per DMP's website. Plaintiff alleges that the catalyst in this reported transition occurred as result of DMP's subsidiary collection agency – Audubon Financial Bureau being closed down and members fined; due to illegal debt collection practices that violated TCPA, FTC and/or FDCPA regulations in a 2013 case; (*13-258 - Sweet et al v. Audubon Financial Bureau, LLC et al).*

109. Plaintiff alleged that Defendants DMP, Mr. Valentine and Mr. March were responsible for the placement of collection portfolios with other selected 3rd party debt collectors and/or companies, such as STP. Plaintiff avers that in their roles as principal, representative and/or authorized agents of CashNetUSA accounts, they have had a fiduciary responsibility to Plaintiff in regards to the protection of Plaintiff's personal and financial banking information and from an invasion of privacy; created when Plaintiff's information was retailed around the country to unethical debt collectors, exposing Plaintiff to repeated and possible future harm.

Furthermore, according to previous posting from LinkIn.com, Mr. March, as a member of DMP, has provided consulting services, in additional to capital and equipment for startup purposes for new collection agencies and representatives and/or agents, such as STP.

Plaintiff further avers that defendants DMP, Adam March and/or Daniel Valentine have violated FDCPA, TCPA and/or FTC regulations while conducting their business and should be held liable as such. Direct corporate liability focuses on the corporation being negligent or liable independent of the conduct of any specific individual. As such, Plaintiff avers that DMP should be held responsible for the illegal debt collections practices employed by their employees, agents and/or authorized representatives such as STP, ACDI and Anthony Swatsworth for the events mentioned throughout this complaint.

110. A seller "sh[ould] be liable for calls made in violation of the TCPA by a third-party vendor only when a seller fails to take certain measures to ensure compliance by third-party vendors during a calling program." Plaintiff asserts that Defendant Anthony Swatsworth, in his official capacity as owner, manager and/or agent of STP or ACDI, did not make any efforts to ensure that 3rd party debt buyers/brokers that were sold or assigned portfolio accounts from or through Anthony Swatsworth, ACDI or STP; complied with FDCPA, TCPA or FCC acts. This was personally evidenced by the numerous harassing debt collection calls received by the Plaintiff and the complaints of spoofing/blocking of Caller IDs #s as reported throughout this complaint.

111. Furthermore, according to the Consumer Financial Protection Bureau, 40 consumer complaints were filed with CFPB from 3/25/2015-11/14/2016 against Defendant Anthony Swatsworth, as owner, manager and/or agent of STP, alleging similar issues as the Plaintiff's claim; concerning illegal tactics such as but not limited to; – taking/threatening legal actions, improper contact and/or sharing of information, threatening jail time and/or false statements of representation and failure to validate debt. Defendants Anthony Swatsworth and STP claim not to have had the account in their office since the end of August of 2014, they also failed to provide Plaintiff with assistance of determining for contact; the current collection agency assigned to account.

More specifically, on 09/19/16, Plaintiff spoke with STP staff and inquired as to whom the account had been placed with, after informing STP of issues within Plaintiff's compliant but to no avail. STP failed to provide the Plaintiff with any information that could assist in stopping the abusive practices of harassment from the in-house collection agencies assigned by STP and Anthony Swatsworth. STP staff simply instructed the Plaintiff to call the numbers back herself and account questions in an attempt to validate the rightful holder of the account. As such, Plaintiff asserts that Anthony Swatsworth and STP as creditor and/or owner, breached their duty of care owed to the Plaintiff by failing to protect Plaintiff's personal and private information from other 3rd party debt brokers or collection agencies, representatives, agents, employees, etc.; whom Anthony Swatsworth and STP knew or should have known; would use Plaintiff's information to attempt to collect and/or extort monies from the Plaintiff; through the use of illegal collection tactics. Therefore, Plaintiff lays claims of liability through both direct corporate and vicarious liability.

112. Moreover, STP and/or Anthony Swatsworth had the right to and the ability to exercise control over its in-house collection agencies and employees. Plaintiff avers that this claim was supported and affirmed when both STP Personnel – Angela and DMP personnel Darlene informed Plaintiff on or about 09/19/16, that the file could be pulled back into STP's office and resolved through them. As such, if Defendants were no longer involved and/or holders of the account, in any fashion, how could they "pull the file" back into their office, from another creditor.

113. Additionally, Plaintiff further avers that a direct agency and principal-agent relationship also existed between Defendants STP, ACDI, Anthony Swatsworth and John Does 1-3. Plaintiff supports this claim by referencing the conversations that occurred on 09/19/16 between Plaintiff and Defendant STP's agents and/or representatives and John Does – Steve Anderson & Mr. Bell and non-party JS Recovery representative Mark Marshall, regarding the numerous movements of the Plaintiff's account from STP and Anthony Swatsworth, to other in-house and outside agencies.

When in-house agencies such as JS Recovery, a non-party to this complaint, were assigned Plaintiff's account to collect on and failed to recover the funds, Plaintiff avers that Defendant STP and/or Anthony Swatsworth exercised his right to control the methods in which the in-house agencies further performed their duties by reassigning the file. He also authorized each to recover funds for the principal – Anthony Swatsworth. Moreover, John Doe – NIC – Steve Anderson explained to the Plaintiff, that the client would send a consumer's file to a collection agency for collection, if funds were not recovered, the client would pull the file, recycle the documents and re-assign to another in-house agency.

114. Plaintiff avers that STP and Anthony Swatsworth also exercised a principal-agent relationship in regards to John Doe – Legal Outsourcing – Mr. Bell. On 09/19/16, as previously mentioned, Mr. Bell informed Plaintiff that he had purchased the Plaintiff's account from STP and Anthony Swatsworth during the latter part of September of 2014. STP personnel – Stephon agreed with Mr. Bell statement concerning ownership/assignment and that he was authorized to work the account and collect on it.

115. Plaintiff agrees with Justice Benjamin Nathan Cardozo (1870-1938; US Supreme Court judge from 1932 to 1938) as he described a fiduciary relationship and/or duty as "something more than the ordinary honor of the marketplace ... the very punctilio of honesty and forthrightness." Fiduciary relationships can exist between an "agent and principal, …. partner and partner, stockholders (shareholders) and directors", etc. In these relationships, law demands a higher than ordinary degree of care and responsibility from the dominant or trusted party. Therefore, a special relationship exists within trust and confidence.

116. The California Court of Appeals defines: A fiduciary relationship as "'any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Furthermore, the traditional definition of a fiduciary relationship. As set forth in *Bacon v. Soule (1912) 19 Cal.App. 428, 434 [126 P. 384]*, for example, reads as follows: "A `fiduciary relation' in law is ordinarily synonymous with a

`confidential relation.' It is also founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and likewise precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed."

**JURY DEMAND**

Wherefore, Plaintiff demands trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Tiffany Roper prays that judgement be entered against the Defendants awarding the Plaintiff the following relief:

**Fair Debt Collection Practices Act – FDCPA**

a. Plaintiff incorporates the foregoing paragraphs by reference.

b. Defendants have violated the FDCPA. Defendant's violations of the FDCPA include, but are not necessarily limited to, the following:

- Defendants have violated **15 U.S.C § 1692b** - communicating with any person other than the consumer for the purpose of acquiring location information about the consumer.
- Defendants have violated **15 U.S.C § 1692c** - Communication in connection with debt collection.

-

- Defendants have violated **15 U.S.C § 1692d** – engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

-

- Defendants have violated **15 U.S.C § 1692e (4)(5)(7)(11)(14)**- use any false, deceptive, or misleading representation or means in connection with the collection of any debt;

a. representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

b. The threat to take any action that cannot legally be taken or that is not intended to be taken.

c. The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.

d. The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector.

e. The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

- Defendants have violated **15 U.S.C § 1692f (1)** - not use unfair or unconscionable meant to collect or attempt to collect any debt.

a. The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

- Defendants have violated **15 U.S.C § 1692g** – Validation of debt.

In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors --

(1) "in any individual action under subsection (a)(2)(A) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional"

**Wherefore,** Plaintiff seeks judgment against each defendants as follows:

- Statutory damages pursuant to 15 U.S.C § 1692k(a)(2)(A); up to 1000.00
- Actual damages;
- Costs (filing fees, etc.) and reasonable attorney's fees pursuant to 15 U.S.C § 1692k(a)(3)
- The Eastern District of Pennsylvania has stated that "violations of the FDCPA, by their very nature are those kinds of actions which may be expected to cause emotional distress and, therefore, the availability of damages for such distress is of paramount importance." *Crossley v. Lieberman 90 B.R. 682, 691 -692 (E.D.Pa.,1988).* Plaintiff avers that she has endured emotional distress concerning this debt during this nearly 3 year span. Plaintiff has suffered documented anxiety issues in which Plaintiff sought medical help from May of 2014 through 2015. Plaintiff obtained treatment for anxiety during 14 doctor visits. Plaintiff has also suffered embarrassment from collection calls placed to an estranged out-of-state relative's cell identifying Plaintiff's name, Plaintiff's cell number and the process of litigation, in addition to the constant calling back and forth between Plaintiff work and cell number while in the presence of others.

Furthermore, Plaintiff also suffered mental anguish from the constant calls by the Defendants and from the Plaintiff's attempts at identification afterwards; as well as sleeplessness. Plaintiff's frustration can be heard in several calls with the Defendants on 09/19/16 and as recent as 11/21/16, when threats of jail time were yelled at Plaintiff in the presence of her kids, causing the kids to be afraid of the Plaintiff going to jail. As such, Plaintiff request damages for the emotional distress endured.

- Such further relief as the court deems just and proper.

**Telephone Consumer Protection Act – 47 U.S.C § 227**

a. Plaintiff incorporates the foregoing paragraphs by reference.

b. Defendants failed to obtain prior express consent before calling Plaintiff cellular telephone number via auto-dailer in violation of TCPA; or in the alternative, if it could be determined consent had been given at some point, Plaintiff verbally revoked the consent during an early collection call in 2014. Furthermore, due to a failure to properly and truthfully identify themselves and the companies, Plaintiff was unable to send written notification revoking consent. Pursuant to the TCPA and FCC's January 2008 Declaratory Ruling, the burden is on the Defendants to demonstrate that it had prior express consent to call Plaintiff's cellular phone with an ATDS.

c. Defendants have violated the TCPA. Defendant's violations of the TCPA include, but are not necessarily limited to, the following:

- Defendants have violated **47 U.S.C § 227(b)(1)(A)**- It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States; to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice.

- Defendants have violated **47 U.S.C. § 227(e)** - It shall be unlawful for any person within the United States, in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value.

Wherefore, Plaintiff seeks judgment against each defendant for:

- Statutory damages pursuant to 47 U.S.C § 227(b)(3)(B) of up to $500 in damages for each and every call in violation.
- Treble damages pursuant to 47 U.S.C § 227(b)(3)(C) of up to $1500.00 for each and every call in violation.
- Costs (filing fees, etc.) and reasonable attorney's fees.

- The Eastern District of Pennsylvania has stated that "violations of the FDCPA, by their very nature, . .re those kinds of actions which may be expected to cause emotional distress and, therefore, the availability of damages for such distress is of paramount importance." *Crossley v. Lieberman 90 B.R. 682, 691 -692 (E.D.Pa.,1988).* A Plaintiff avers that she has endured emotional distress concerning this debt during this nearly 3 year span. Plaintiff has suffered documented anxiety issues in which Plaintiff sought medical help from May of 2014 through 2015. Plaintiff obtained treatment for anxiety during 14 doctor visits. Plaintiff has also suffered embarrassment from collection calls placed to an estranged out-of-state relative's cell identifying Plaintiff's name, Plaintiff's cell number and the process of litigation, in addition to the constant calling back and forth between Plaintiff work and cell number while in the presence of others. Furthermore, Plaintiff also suffered mental anguish from the constant calls by the Defendants and from the Plaintiff's attempts at identification afterwards; as well as sleeplessness. Plaintiff's frustration can be heard in several calls with the Defendants on 09/19/16 and as recent as 11/21/16, when threats of jail time were yelled at Plaintiff in the presence of her kids, causing the kids to be afraid of the Plaintiff going to jail. As such, Plaintiff request damages for the emotional distress endured.
- Such further relief as the court deems just and proper.
- Plaintiff is entitled to and seeks injunctive relief prohibiting such conduct by the Defendant in the future.

**Federal Communications Commission – Code of Federal Register - 47 CFR 64**

a. Plaintiff incorporates the foregoing paragraphs by reference.

b. Defendants have committed the following violations as well;

- **47 C.F.R. § 64.1601(e)** - (e) Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(10) must transmit caller identification information; (1) For purposes of this paragraph, caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer; (2) Any person

or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information

- **47 C.F.R.64.1604** - Prohibition on transmission of inaccurate or misleading caller identification information; (a) No person or entity in the United States shall, with the intent to defraud, cause harm, or wrongfully obtain anything of value, knowingly cause, directly or indirectly, any caller identification service to transmit or display misleading or inaccurate caller identification information.

Dated this 28th of November, 2016.

Tiffany Roper – Pro Se